**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| A.P., *by and through next friend* S.P.; S.P., *in her individual capacity*; C.H., *by and through her parents* C.W.H. *and* M.H.; *and* M.H., *in her individual capacity*,<br><br>*Plaintiffs*,<br><br>v.<br><br>STEVEN MARSHALL, *in his official capacity as Alabama Attorney General*,<br><br>*Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CIVIL CASE NO. ________**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**ORAL ARGUMENT REQUESTED** |

**<u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

## PRELIMINARY STATEMENT

1. Alabama has passed a law presumptively banning teenagers—and restricting everyone else—from accessing vast online libraries of fully protected speech. Sweeping even more broadly than other recent attempts to childproof the internet, the Alabama App Store Accountability Act, Ala. Code §§ 8-19K-1 *et seq.* (Ex. A) (the "Act"), requires anyone in Alabama to prove their age before downloading any mobile application content—from the ESPN and Wall Street Journal apps, to Coursera, Spotify, Audible, Kindle, and Wikipedia. Minors are banned from accessing pre-installed apps or downloading any new apps—as well as paid content within any app—without parental consent. Parents must verify their identity and authority to provide such consent. And even willing parents who judge their teenagers responsible enough to choose apps, categories of apps, or paid content within apps for themselves must still provide *individual consent for every download* no matter their aversion to state-mandated surveillance.

2. The Act violates the First Amendment. Defying the Supreme Court's insistence that governments have no "free-floating power to restrict the ideas to which children may be exposed," *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794–95 (2011), the Act imposes content-based prior restraints on speech that replace parents' freedom to moderate their children's access to sources for learning, communication, and creativity with "what the State thinks parents *ought* to want."

*Id.* at 804. It thus violates the rules that speech "neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them," and that the government has no "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* at 795 & n.3 (citation & internal quotation marks omitted).

3. Just as the government could not compel a bookstore to screen patrons and stop minors from purchasing any book without parental approval, the State cannot ban minors from downloading digital content through app stores or within apps without parental consent. The Act is thus unlike the statute upheld in *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461 (2025), as the Act targets and restricts access to "fully protected" materials, not just adult content that is unprotected as to minors. *Id.* at 482–85, 490–93 & n.12. Strict scrutiny applies, and the State fails that standard—especially given the less-restrictive voluntary parental controls available and the existing, more-targeted laws that Alabama could instead enforce.

4. The Act's blanket requirements independently violate parents' fundamental right to make developmental decisions involving how much independence to grant their children on their mobile devices. By requiring individualized consent as to each and every app and app-based purchase—and renewed consent each time an app notices a significant change until a child is 18

years old—the Act prohibits parents from tailoring the level of oversight they want to apply, which may differ between children and over time. The regime substitutes the State's judgment mandating total surveillance of every child for that of even fit parents who would make different decisions in the best interests of their individual children, at different stages of their respective development, without justification.

5. Plaintiffs are Alabamian minors whom the Act will restrict from communicating, accessing information, and engaging in protected expression, as well as Alabamian parents whose rights to direct the upbringing of their minor children will be abridged by the Act's parental consent regime. They include two high-school students who use apps to study, organize extracurricular activities, share their political views, communicate with peers, create art, and engage with others' expressive works, and each of their parents, who object to the Act's rigid surveillance and consent requirements as inconsistent with and damaging to their careful approach to parenting. Plaintiffs bring this action to vindicate their First and Fourteenth Amendment rights by obtaining an order invalidating and enjoining the Act's challenged provisions.

**PARTIES**

6. Plaintiff A.P. is a sixteen-year-old homeschooled high-school junior in Alabama. She is a thespian, musician, and avid crocheter. She accesses content through a variety of apps on her Android smartphone that she downloads from the

Google Play Store and Amazon Appstore. These include Khan Academy, through which she completes most coursework, and Lingodeer, which she uses to learn French. She also uses social media and messaging apps—including GroupMe, TikTok, Discord, Instagram, Facebook, Pinterest, and Reddit—to stay connected with friends and family, explore creative interests like drawing and baking, educate herself on current events, and participate in a community volunteer organization that does charitable work and provides leadership training to teenagers. A.P. brings this action through her mother, S.P., under Federal Rule of Civil Procedure 17(c)(1).

7. Plaintiff S.P. is A.P.'s mother, and has had responsibility for A.P.'s homeschooling since second grade. S.P. wants A.P. to learn to make decisions for herself while she is still at home and can turn to her parents for guidance. As A.P. has shown good judgment, S.P. has stepped back. Conversations about downloading new apps, books, and movies now happen because A.P. wants advice, not because she needs permission. S.P. believes that giving A.P. autonomy has helped her become confident and self-sufficient without making her less willing to ask for help. S.P. objects to the State requiring her to impose a level of oversight over A.P.'s mobile app usage that she has already deliberately chosen to lift—undermining both her parenting choices and the trust she and A.P. have built.

8. Plaintiff C.H. is a sixteen-year-old high-school junior in Alabama. She is an avid reader, works at a local animal shelter, and volunteers as a student activist

with a national non-partisan anti-censorship organization. She uses a variety of apps on her iPhone and iPad that she downloads through the Apple App Store. For school, she uses Rooms to communicate with teachers, BAND to get band schedules and announcements, and YouTube for math tutorials. For her advocacy, she uses Discord, WhatsApp, Zoom, and Google Meet. She also uses apps such as Instagram, TikTok, Threads, Snapchat, and GroupMe to share her views, keep up with current events, and stay connected with friends. C.H. brings this lawsuit through her parents, C.W.H. and M.H., pursuant to Federal Rule of Civil Procedure 17(c)(1).

9. Plaintiff M.H. is a public-school teacher in Alabama, and a mother of three children, including C.H. Her parenting philosophy is to apply tailored oversight to each child and reduce that oversight as her children show responsibility, with a goal of fostering trust and allowing her children the freedom and privacy to apply the lessons they have learned. In this way, M.H. and her husband, C.W.H., try to ensure their children can develop good judgment before they reach adulthood. Applying this approach, M.H. and C.W.H. have provided C.H. increasing freedom as she has shown responsibility, including removing parental controls from her phone and encouraging C.H. to come to them when she wants advice. C.H.'s parents want her to be able to seek out information freely—including information related to health, school, personal interests, and current events—without feeling monitored or surveilled. M.H. believes her family's parenting approach has helped her children

develop high levels of confidence, good judgment, and the ability to solve problems for themselves. M.H. objects to the State undoing her careful work by requiring oversight and permission where she has decided they are no longer needed.

10. Defendant Steven Marshall, the Alabama Attorney General, is charged with enforcing the Act. *See* Ala. Code § 8-19K-11. He is sued in his official capacity.

**JURISDICTION AND VENUE**

11. This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a) because Plaintiffs' claims arise under the United States Constitution and the Civil Rights Act, 42 U.S.C. §§ 1983, 1988.

12. This Court has authority to grant injunctive relief under 28 U.S.C. § 1651 and *Ex parte Young*, 209 U.S. 123 (1908), because the Act directs Defendant Marshall to enforce the Act. *See* Ala. Code § 8-19K-11.

13. This Court also has authority under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), to decide this dispute and award relief because the litigation presents an actual case or controversy within the Court's jurisdiction for the same reasons.

14. Venue is proper in this District because Defendant resides in this District, 28 U.S.C. § 1391(b)(1), and because substantial events material to Plaintiffs' claims occurred in this District, *id.* § 1391(b)(2).

## FACTUAL ALLEGATIONS

15. The Act restricts Alabamians' access to vast quantities of information and important fora for human communication. The burdens on speech are significant and impermissible.

### A. App stores are libraries for digital content.

16. App stores allow anyone with a smartphone and an internet connection to access the accumulated sum of virtually all recorded human knowledge.[1] On Apple's iOS App Store alone, more than 1 billion people have access to millions of apps, published by more than 30 million developers. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 967 (9th Cir. 2023). Other major app stores in the United States include the Google Play Store for Android OS devices, the Amazon Appstore for Fire Tablets and Fire TV systems, the Galaxy Store for Samsung devices, and the Microsoft Store for Surface devices. Most Americans, and nearly all teenagers, use app stores to access, engage with, and contribute to the information and expression disseminated online.[2] Mobile applications are thus by many measures the dominant

---

[1] Nicole Shekhovtsova & Marc Scribner, *The App Store Accountability Act would undermine privacy and parental choice*, REASON FOUND. (MAY 7, 2025), https://perma.cc/9UHL-XVU2.

[2] *See Sensor Tower: Consumer Spending on Apps Soared in 2024 and Mobile Rode the Wave of AI Enthusiasm*, PR NEWSWIRE (Jan. 22, 2025), https://perma.cc/H6W6-8E8N; *Teens and Internet, Device Access Fact Sheet*, PEW RSCH. CTR. (July 10, 2025), https://perma.cc/CKF6-3EAY; Laura Ceci, *Mobile app usage of children in the United States—statistics & facts*, STATISTA (NOV. 22, 2024), https://perma.cc/7APU-DQ3G.

fora in which humankind—and especially young people—speak, communicate, and express themselves.

17. App stores deliver and facilitate speech in every imaginable way, serving as the gateway to the applications through which users access the internet. Some of those applications, such as Wikipedia, search apps, and internet browsers, are tools to search and discover all the information that exists online. Others, such as WhatsApp, Slack, and Signal, provide messaging services for direct communication. Audible, Kindle, Netflix, Spotify, YouTube, and similar apps contain libraries of music, movies, television shows, books, audiobooks, and podcasts. Coursera, Codecademy, and Duolingo provide access to educational programming. Media organizations like AL.com, the New York Times, the Wall Street Journal, ESPN, Sports Illustrated, and the Atlantic offer apps that distribute reporting, essays, and videos. Some apps, like Substack, Medium, SoundCloud, and CapCut, function as publishing studios to create and share writing, music, videos, and other expressive content. Gaming applications like Minecraft and Terraria publish creative interactive worlds for exploration and entertainment. And of course, social media apps like X, Facebook, Instagram, TikTok, Reddit, and Snapchat provide fora for sharing digital media. In short, the information distributed through apps is "as diverse as human thought." *Reno v. ACLU*, 521 U.S. 844, 852 (1997) (cleaned up).

**B. Plaintiffs use app-store distributed applications for expression, communication, education, and advocacy.**

18. Plaintiffs use a variety of applications that they download from the Apple App Store, Amazon Appstore, and Google Play Store as a regular part of their daily lives. These applications include but are not limited to the following:

19. ***Messaging apps***. Numerous apps allow students to communicate with each other and with trusted adults. Mobile devices include pre-installed direct messaging apps, like Apple's Message app. Schools and other student educational organizations use other apps for direct communication among students and teachers. Plaintiff A.P. uses her phone's default messaging app as well as BAND to coordinate theater rehearsals, GroupMe to chat and make plans with her closest theater friends, Facebook Messenger Kids to talk to her sibling, and Discord to organize volunteer activities. Plaintiff C.H. uses Apple's Message app as well as Rooms to communicate with teachers, BAND to receive school band announcements and rehearsal schedules, and Discord, WhatsApp, and Google Meet to coordinate her anti-censorship advocacy.

20. ***Content library apps.*** Certain apps function as libraries for books, music, and video content that allow both teens and adults to access and enjoy a wide range of expressive and informational material. Spotify, for example, hosts music and podcasts. Audible offers audiobooks and podcasts. And Libby allows users to "borrow" e-books from public libraries. Video-content libraries, such as YouTube

and Prime Video, are especially popular with teens. YouTube in particular is "the most widely used platform," used by around ninety percent of teens,[3] and has a "staggering" volume and variety of video content.[4] A.P. uses Kindle, Libby, and CloudLibrary to download and read books and other materials for school assignments. She uses the Disney+ app to watch television shows like *Owl House* and the Amazon Music app to listen to her favorite artists, like Blondie and the B-52s. And she uses TikTok and Pinterest to watch videos from creators who inspire her, including crochet artists and portraitists. C.H. uses YouTube to watch math tutorials for school and true-crime videos and gardening videos at home with M.H. She also uses YouTube Music to listen to her favorite artists, including Weezer, on the go, and uses Amazon Prime Video to watch shows like *House*.

21. As a result of their ubiquity and variety, video library apps in particular are a popular forum for learning about new topics—more so than traditional books or websites. YouTube, for example, operates a channel called YouTube Teachers, where teachers can share lessons.[5] Teachers "Rob and Jeremy" (@mathantics) share lessons on algebra and geometry with their 3.88 million YouTube subscribers.

---

[3] Monica Anderson et al., *Teens, Social Media and Technology 2023*, PEW RSCH. CTR. (DEC. 11, 2023), https://perma.cc/8QPC-ZKYV.
[4] Patrick Van Kessel et al., *A Week in the Life of Popular YouTube Channels*, PEW RSCH. CTR. (JULY 25, 2019), https://perma.cc/X6FK-67QD.
[5] Teachers (@teachers) YouTube, https://perma.cc/M7UG-9WM4 (last visited Oct. 27, 2026).

Science teacher and author Dave Farina (@ProfessorDaveExplains) posts study guides and lessons in high school physics and biology to his 4.48 million YouTube subscribers. And Phillip Cook (@chemteacherphil) shares chemistry lessons with his 1.42 million YouTube subscribers.

22. ***Educational apps.*** In addition to all-purpose online content apps, many mobile apps are developed specifically for educational purposes. Apps like Chegg, Quizlet, and Course Hero provide students with on-demand tutoring, study guides, tutorials, and course reviews for subjects like English, social studies, foreign languages, and STEM disciplines.

23. A.P., for instance, uses the Khan Academy App daily to access her math, reading, and history lessons for her homeschooling curriculum. She also uses the CloudLibrary app to borrow library books for her assigned readings, and Lingodeer for her French elective course. And C.H. uses Canvas for her college coursework.

24. ***News apps.*** Mobile apps have become a major distribution method for both traditional and non-traditional news platforms. Of the 105 most-visited news outlets in 2023, around three quarters had dedicated mobile apps, and at least ninety-two percent were available through news-aggregator apps like Flipboard.[6] News

[6] *Digital News Fact Sheet*, PEW RSCH. CTR. (Nov. 10, 2023), https://perma.cc/9JHU-6FU9.

apps also allow users to receive breaking news alerts on major events and specific areas of interest. A.P. uses the ThreadLine and Glance apps to receive news alerts so she can be informed of and read about current events in real time.

25. ***Content creation apps.*** In addition to apps allowing users to view and engage with content, apps like CapCut and Canva—as well as apps like TikTok, YouTube, Pinterest, and Instagram—allow users to create content. A.P. uses apps like CapCut to create "fan edits" of her favorite television shows, which she shares on TikTok. She also uses IbisPaint to create portraits, and Canva to design promotional materials for the community nonprofit organization she volunteers with. C.H. uses the Apple Freeform app as her personal diary.

26. ***Social media apps.*** Social networks provide platforms for communication, expression, education, and association. Approximately ninety percent of teenagers between ages thirteen and seventeen have at least one social network account.[7] More than half of teens use TikTok, Snapchat, and Instagram.[8] All of these platforms were created as mobile apps and are designed primarily for mobile app usage.[9] A.P. and C.H. use social media apps including TikTok,

---

[7] Susan Laborde, *Teenage Social Media Usage Statistics in 2023*, TECHREPORT (updated May 30, 2024), https://web.archive.org/web/20240714214018/https://techreport.com/statistics/software-web/teenage-use-of-social-media-statistics/.

[8] *See* Anderson, *supra* note 3.

[9] Rebecca Fannin, *The Strategy Behind Tiktok's Global Rise*, HARV. BUS. REV. (Sep. 13, 2019), https://perma.cc/K7JA-XYR9; Kevin Systrom, *Introducing Your Instagram Feed on Desktop*, INSTAGRAM (FEB. 5, 2013), https://perma.cc/2XNW-

Instagram, Snapchat, Facebook, Threads, Reddit, and Pinterest. C.H. and her siblings regularly use Instagram's direct messaging to receive information about local events and cultural activities from C.W.H.

27. On Pinterest, A.P. views other artists' content to inspire her own crocheting projects and illustrations, often finding reference images posted by other creators. A.P. also uses Facebook to connect with her local crocheting community, and Facebook Marketplace to sell her own crochet crafts. A.P. also uses Reddit to view theater set designs to help inspire her theater group. C.H. uses Instagram to post about bands she likes and connect with peers who share similar interests in music and television.

28. Social networking apps are integral to modern life, for both teens and adults. Among other things, social networks provide an essential outlet for political expression. Youth-led movements have used social media to bring attention to issues not adequately covered in traditional media. Students at Marjory Stoneman Douglas High School in Parkland, Florida, have used social networks to advocate for gun violence prevention after a school shooting there killed seventeen people.[10] Middle- and high-school students have used social media to create a national network of

LMBF; Jonathan Vanian, *Snapchat is finally coming to the web after more than a decade as a mobile app*, CNBC (JULY 18, 2022), https://perma.cc/JU62-T7LA.

[10] Jonah E. Bromwich, *How the Parkland Students Got So Good at Social Media*, N.Y. TIMES (Mar. 7, 2018), https://perma.cc/H42Y-TDEK.

"Sunrise Movement" chapters to combat climate change.[11] And the libertarian non-profit BASEDPolitics uses social media to "introduce young people 'to the ideas of free market capitalism and individual liberty.'"[12]

29. C.H. uses Instagram to express her political views, draw attention to causes and fundraisers she cares about, and engage peers in conversations about important social and political topics. Through posting or reposting political and advocacy-related content online, C.H. uses social media to participate in public discourse and to express views on issues affecting her community. A.P. also learns about her peers' political views through social media apps like Instagram and TikTok, follows a number of political commentary accounts, and often reposts TikToks that reflect her political views as a way of speaking out about important public issues.

30. Politicians and lawmakers similarly use social networks to communicate with voters (including teenage voters), as well as teens approaching

[11] Emma Weber, *How Young People Make Change*, THE PROGRESSIVE MAG. (Apr. 22, 2025), https://perma.cc/24Y6-YJGY.
[12] Elizabeth Nolan Brown, *'If They Can Control the Flow of Information They Can Control You': BASEDPolitics Sues To Stop TikTok Ban*, REASON (JUNE 10, 2024), https://perma.cc/9LME-YVZD.

voting age.[13] Social media is "near-ubiquitous among members of Congress."[14] C.H. uses social media to follow politicians across the political spectrum, which she believes is the best way to understand differing viewpoints, stay informed about current events, and form her own opinions.

31. Social networks are a principal source of news for most Americans.[15] More than half of teens access news using social networks at least a few times per week, including on Instagram, Facebook, and X.[16] To keep abreast of the news, A.P. and C.H. follow diverse outlets on TikTok, Threads, and Instagram, including ABC, BBC, Fox News, and local news sources. TikTok and Threads are C.H.'s primary sources for news. She makes a point of seeking out accounts that feature political viewpoints different from her own on these platforms.

32. Social media is also an "important venue for interaction and conversation among" American teenagers and "plays a critical role in connecting

---

[13] Laura Barrón-López et al., *How social media influencers are playing a role in the presidential election*, PBS NEWS (Mar. 19, 2024), https://www.pbs.org/newshour/show/how-social-media-influencers-are-playing-a-role-in-the-presidential-election.

[14] Patrick Van Kessel et al., *The congressional social media landscape*, PEW RSCH. CTR. (July 16, 2020), https://perma.cc/YS6K-UGFE.

[15] Jeffrey Gottfried & Elisa Shearer, *News Use Across Social Media Platforms 2016*, PEW RSCH. CTR. (May 26, 2016), https://perma.cc/R39S-2FU6.

[16] Common Sense Media, *New Survey Reveals Teens Get Their News From Social Media and YouTube* (Aug. 12, 2019), https://perma.cc/G3JD-5SPB; *see also* Michael Boulter & Lizz Bolaji, *In the age of memes, how are young people getting their news?*, PBS NEWS (Jan. 23, 2020), https://perma.cc/J9G6-DAVA.

teens to new friends" by "allowing teens to learn more about new friends and get to know them better."[17] One recent study found teenagers who use social networks reported that they feel more connected to their friends (eighty percent); had somewhere to express their creativity (seventy-one percent); had a support network in challenging times (sixty-seven percent); and were more accepted (fifty-eight percent).[18] Overall, U.S. teenagers are more likely to report that social networks have positive rather than negative effects on their lives.[19] In fact, research suggests that the isolation that results from disconnecting teens from social networks may be more harmful to their self-esteem and well-being than is heavy use of the medium.[20]

33. As a homeschooled student, A.P. regularly uses social media to stay connected with both new and longtime friends whom she rarely sees in person. And by sharing Instagram stories and posts about music and movies, C.H. has discovered common interests with peers at school and formed friendships that otherwise would

---

[17] Amanda Lenhart, *Chapter 4: Social Media and Friendships*, PEW RSCH. CTR. (Aug. 6, 2015), https://perma.cc/3QRY-N2X4.

[18] Emily A. Vogels & Risa Gelles-Watnick, *Teens and social media: Key findings from Pew Research Center surveys*, PEW RSCH. CTR. (Apr. 24, 2023), https://perma.cc/DF3Y-PPG2.

[19] *Id.*

[20] Keith N. Hampton & Inyoung Shin, *Disconnection More Problematic for Adolescent Self-Esteem than Heavy Social Media Use: Evidence from Access Inequalities and Restrictive Media Parenting in Rural America*, 41:2 SOC. SCI. COMP. REV. 626 (Aug. 5, 2022); *see also* Sarah Coyne et al., *Teaching By Example: Media and Parenting Practices that are—and are not—Related to Adolescent Mental Health*, WHEATLEY INST. (2022), https://wheatley.byu.edu/00000182-8d78-dff6-afab-8ffd11ce0001/teaching-by-example-pdf.

not have developed. One of C.H.'s closest friendships is maintained primarily through Instagram, where they stay connected by regularly exchanging reels, memes, and story responses, even during periods when they are not otherwise in frequent in-person contact.

34. Finally, discussion- or "Q&A"-based social networking apps—such as Reddit, Quora, and Goodreads: Book Reviews—provide content about topics ranging from "How-To" videos for home improvement projects to personal finance tips to book reviews.[21] Reddit subgroups for craft projects, yoga, meditation, baking, and running each have more than 1.8 million members,[22] and groups for gardening and woodworking each have more than five million members.[23] A.P. uses Reddit to research theater sets and find inspiration for her theater group.

35. The role of social networks in fostering community and connection—what some researchers have called the development of one's social, religious,

[21] Reddit, r/DIY, https://www.reddit.com/r/DIY/ (last visited Oct. 27, 2026) (DIY Reddit has 680K members); Reddit, r/personalfinance, https://www.reddit.com/r/personalfinance/ (last visited Oct. 27, 2026) (Personal Finance Reddit has 1.6M weekly visitors).

[22] Reddit, r/crafts, https://www.reddit.com/r/crafts/ (last visited Oct. 27, 2026); Reddit, r/yoga, https://www.reddit.com/r/yoga/ (last visited Oct. 27, 2026); Reddit, r/Meditation, https://www.reddit.com/r/Meditation/ (last visited Oct. 27, 2026); Reddit, r/Baking, https://www.reddit.com/r/Baking/ (last visited Oct. 27, 2026); Reddit, r/running, https://www.reddit.com/r/running/ (last visited Oct. 27, 2026).

[23] Reddit, r/gardening, https://www.reddit.com/r/gardening/ (last visited Oct. 27, 2026); Reddit, r/woodworking, https://www.reddit.com/r/woodworking/ (last visited Oct. 27, 2026).

cultural, and political identity—is one of their most profound contributions.

**C. Alabama enacts the App Store Accountability Act.**

36. On February 17, 2026, Alabama Governor Kay Ivey signed the Act into law. Its requirements take effect on January 1, 2027.

37. The Act restricts and burdens speech in a variety of ways. Broadly, the Act creates age-verification and parental-consent mandates under which minors may not download apps or make paid purchases within apps without individualized parental consent. The Act regulates both app stores and the app developers whose apps appear in those stores. It additionally requires app stores to display to parents age ratings and content descriptions for apps and in-app purchases where available.

38. ***Scope***. The Act governs "app store providers" who "own[], operate[], or control[] app store[s]"—defined as any "publicly available website, software application, or electronic service that allows [users] to download apps from third-party developers onto a mobile device," such as a smartphone or tablet. Ala. Code §§ 8-19K-1(6)–(7). It also regulates "[d]eveloper[s]," who own or control apps published through app stores or as pre-installed apps. *Id.* § 8-19K-1(9).

39. The Act applies only to app downloads, pre-installed apps, and paid content purchased within apps on mobile devices, not content accessible through web browsers, or apps available on non-mobile devices such as internet-connected televisions. This leads to inconsistent regulation of the same apps, services, or

content on different devices, as well as of the same types of apps on any given device.

40. *First*, certain apps that are covered by the Act on mobile devices are outside the scope of the Act if accessed through a web browser or non-mobile device smart technology. Spotify, for example, is available both as a mobile app and through a web player accessible by a web browser like Google Chrome or Firefox. Thus, the app is subject to the parental-consent requirement only when downloaded from an app store on a mobile device, but not when accessed through a browser window or downloaded as an app on a smart television. A different set of restrictions might accordingly apply to the same person on different devices.

41. *Second*, the requirement for parental consent before a minor "make[s] an in-app purchase," *id.* §§ 8-19K-1(10); -3(2), will apply differently to the same content across users. A minor who has the Disney+ app and a Disney subscription will not need parental consent to download *Finding Nemo* on their mobile device, but another will require consent to rent the same movie in the Apple TV app. But neither minor will require consent to rent the movie on their internet-connected TV or to purchase the DVD at Best Buy.

42. ***Age-verification and parent-identification mandates.*** Before anyone in Alabama may create an account to access an app store, the app store must "[r]equest age category information from the individual" and "[v]erify the

individual's age category" using "commercially available methods that are reasonably designed to ensure accuracy" or "[a]n age verification system that complies with rules adopted pursuant to this [act]." *Id.* § 8-19K-2(1)–(2)(a)–(b). Among these methods is an "affirmative age attestation by an individual who is reasonably believed to be the parent or legal guardian of the minor." *Id.* § 8-19-K-2(b)(i). The age categories are: (i) under thirteen years of age; (ii) at least thirteen years of age but less than sixteen years of age; (iii) at least sixteen years of age but less than eighteen years of age; and (iv) at least eighteen years of age. *Id.* § 8-19K-1(2). When a developer is implementing any safety-related features or defaults that it has developed, it is required to "use the lowest age category indicated by" either "age verification data provided by an app store provider" or "age data independently collected by the developer." *Id.* § 8-19K-9(a)(5).

43. An app store may not permit anyone under eighteen to download apps, purchase an app, or make an in-app purchase until the minor "affiliate[s] with a parent account" and the app store "[o]btain[s] verifiable parental consent" from the parent or guardian holder of that parent account. *Id.* § 8-19K-3(1)–(2). Thus, any individual identified as a minor must identify his or her parent or guardian, and app store owners must then employ age and identity verification tools to confirm that the prospective "parent account" in fact belongs to an adult parent or guardian of the minor. *See id.*; *id.* § 8-19K-1(16)–(17).

44. ***Parental-consent mandate.*** Even if a minor affiliates with a parent or guardian, that does not mean the minor may download apps as the minor or her parents wish. Instead, *each time* a minor wishes to download an app from an app store, begin using a pre-installed app, or purchase content within an app the minor has already downloaded with her parent's consent, that minor must "[o]btain verifiable parental consent." *Id.* § 8-19K-3(2). Consent requires app stores to provide the parent with any age rating or content description information available for the app or in-app purchase. *Id.* § 8-19K-1(17)(d)–(e). Minors who cannot obtain consent may not access the content. *Id.* §§ 8-19K-3(2)–(3), -7(2). App stores must also share a user's age and parental-consent information with app developers, *id.* § 8-19K-5, who are also required to ensure that minors lacking qualifying consent do not access their content, *id.* § 8-19K-9(a)(4).

45. The Act does not permit parents to authorize multiple downloads or purchases. Instead, they must grant separate consent for each and every individual download or purchase sought by their child. *See id.* § 8-19K-3(2). Even when a parent grants consent, an app store must revoke it whenever there is a "[s]ignificant change" affecting the type of data the app collects, stores, or shares; its age rating or content descriptions; or its available monetization features. *Id.* § 8-19K-4(2)(b).

46. ***Enforcement.*** An app store that fails to enforce the State's restrictions may be punished by the Alabama Attorney General. *Id.* § 8-19K-11(a). The statute

permits penalties up to $7,500 per violation. *Id.* Given the millions of app-store and app users in Alabama, penalties under the Act could prove extraordinary. Avoiding these penalties will require app stores to restrict Alabamians, including Plaintiffs, from using app stores to access protected media, entertainment, information, and forums for communication.

**D. The Act severely burdens and prevents speech.**

47. The Act creates significant and unjustifiable burdens on all Alabamians' ability to share and receive information and expression.

48. ***The age-verification, parent-identification, and parental consent mandates create barriers to speech.*** The Act's age-verification mandate—which applies to all Alabamians, including adults like S.P., M.H., and C.W.H.—is by itself an invasive and significant barrier to speech. Age and identity-verification technologies may force disclosure of sensitive personal information, such as government-issued IDs, credit card information, or biometric data.[24] Many people would prefer not to disclose that information, and some may lack identity-verifying documents altogether.[25] When imposed, as here, as a precondition to engage in

---

[24] Eric Goldman, *The "Segregate-and-Suppress" Approach to Regulating Child Safety Online*, 28 STAN. TECH. L. REV. 173, 205 n.129, 202–08 (2025).

[25] Jillian A. Rothschild et al., *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge* 2, Univ. Md. Ctr. for Democracy & Civic Engagement (June 2024), https://web.archive.org/web/20240624234910/https://cdce.umd.edu/sites/cdce.umd.edu/files/pubs/Voter%20ID%202023%20survey%20Key%20Results%20Jan%202

speech, the effects are to prevent speech before it can occur, and to raise the cost of engaging in any speech.[26]

49. These burdens are compounded for minors because the Act also requires them to affiliate with a parent or guardian who must submit unspecified yet inevitably sensitive documentation (like a birth certificate or adoption record) verifying their legal authority. This double-layered verification regime means a teenager's ability to access (or publish) content in an app store's content library is not only limited by their own willingness and ability to submit documents sufficient to verify their age, but also by their parents' willingness and ability to do so. And access is further limited by the parental-consent mandate, which requires verifiable parental consent before minors may obtain any apps or downloadable material within an app in each instance, even if a parent would want to provide blanket consent as to certain categories of material. This reflects the Act's focus on burdening access to speech the State deems unsuitable, rather than on empowering parents.

50. The effect in many, if not most, cases will approximate a ban. Americans—including Plaintiffs A.P., S.P., C.H., and M.H., and parent-declarant

---

024%20(1).pdf; Shoshana Weissmann, *Kids Don't Have IDs And Age-Estimation Tech Is Frequently Very Wrong*, TECH DIRT (May 23, 2025), https://perma.cc/2HJF-XB4J.

[26] *See* Goldman, *supra* note 24 at 216.

C.W.H.—are all worried about the security and reliability of age verification. Sixty-six percent of Americans say they "are not comfortable sharing their identification documents or biometric information with online platforms," and seventy percent say they are "uncomfortable with their children using such methods." *Free Speech Coal., Inc. v. Rokita*, 738 F. Supp. 3d 1041, 1049 (S.D. Ind. 2024) (citing evidence) (cleaned up), *vacated on other grounds*, 2025 WL 2027434 (7th Cir. July 15, 2025). Their reluctance is understandable. Available age-verification and parent-identification methods bear the risk that sensitive personal information and documents could be stolen or leaked.[27] Other nascent age-verification methods—such as artificial intelligence, facial analysis, or facial recognition—pose their own transparency, security, and privacy concerns.[28] Indeed, a recent data breach of an app that required identity verification through photos or IDs resulted in a trove of user photos and identification cards being leaked online, with the hackers reportedly creating a map to tie users to their locations.[29] Another recent breach of an age-

---

[27] Jackie Snow, *Why Age Verification Is So Difficult for Websites*, WALL ST. J. (Feb. 27, 2022), https://www.wsj.com/articles/why-age-verification-is-difficult-for-websites-11645829728; Trevor Wagener, *App Store Age Verification: Popular in Princple, Unworkable in Practice*, COMPUT. & COMMC'NS INDUS. ASS'N (Oct. 21, 2025), https://ccianet.org/articles/app-store-age-verification-popular-in-principle-unworkable-in-practice/ (last visited Oct. 27, 2026).

[28] *See* David McCabe, *Anonymity No More? Age Checks Come to the Web*, N.Y. TIMES (Oct. 27, 2021), https://tinyurl.com/3tp665yf.

[29] Isabella Kwai, *What to Know About the Hack at Tea, an App Where Women Share Red Flags About Men*, N.Y. TIMES (July 26, 2025), https://www.nytimes.com/2025/07/26/us/tea-safety-dating-app-hack.html.

verification vendor resulted in the leak of 70,000 Discord users' identification photos.[30] Numerous other age-authentication companies have suffered data breaches.[31] And in evaluating a California law imposing a similar age-verification mandate, the California Privacy Protection Agency confirmed that "there is currently no privacy-protective way to determine whether a consumer is a child."[32] Users who do not wish to expose themselves to the privacy risks associated with age verification—or whose parents, if they are minors, refuse to do so—will be shut out of app stores altogether.[33]

51. The age-verification, parent-identification, and parental-consent mandates will restrict Plaintiffs' ability to share and receive information and expressive content. The Act requires applying these mandates to existing accounts before the end of 2027. Ala. Code § 8-19K-2(a). And the app stores that Plaintiffs use have warned that under the Act, they will be required to impose the Act's censorship on users like Plaintiffs.[34] The effects will be real and immediate.

---

[30] Osmond Chia, *ID photos of 70,000 users may have been leaked, Discord says*, BBC (Oct. 9, 2025), https://perma.cc/PB56-UUZA.

[31] Goldman, *supra* note 24 at 205 n.129.

[32] Memorandum from Maureen Mahoney, Deputy Dir. Pol'y & Legis., CAL. PRIV. PROT. AGENCY, to the Cal. Priv. Prot. Agency Bd. 5 (May 3, 2024), https://perma.cc/AGT5-KNUY.

[33] Goldman, *supra* note 24 at 204, 206–09 (discussing the tendency of users to "bounce"—i.e., abandon attempts to gain access—when presented with an age verification "wall").

[34] *See*, *e.g.*, Letter from Kouri Marshall, Chamber of Progress Sr. Dir. of State & Loc. Pub. Pol'y to Gov. Kay Ivey, Re: Veto AL HB 161-App Store Age Verification

52. A.P. and C.H., who both use app-based channels to engage in volunteer policy work through nonprofits, will have their access to these vital opportunities for community and political engagement stifled by the need to obtain parental consent for each communication app they want to download, as well as whenever any of their existing apps notices a "significant change." This would also pose challenges to their ability to access educational materials for schoolwork and creative enrichment—including learning tools and content creation apps—while their parents are at work or otherwise not able to immediately respond to consent requests.

53. ***The parental-consent mandate amplifies the barriers to speech and undermines parental decision making.*** Even after a minor convinces a parent to provide documentation sufficient to establish that parent's legal authority, the Act bans that minor from downloading any additional apps from app store libraries, or purchasing paid content within already-downloaded apps—no matter the app or content at issue—unless the minor obtains approval from that parent each and every time they wish to access a new app or new paid content within an app.

---

(Feb. 10, 2026), https://progresschamber.org/wp-content/uploads/2026/02/AL-HB-161-App-Store-Age-Verification-Veto.pdf; Letter from Tom Mann, Comput. & Commc'ns Indus. Ass'n State Pol'y Manager to Ala. House State Gov't Comm., Re: HB 161 – "Consumer protection, app store providers and developers required to take certain actions related to age verification and parental consent, Attorney General authorized to bring action for violations as deceptive trade practice, parents authorized to bring civil action" (Oppose) (Jan 14, 2026), https://ccianet.org/wp-content/uploads/2026/01/AL-HB-161-comments-1.pdf.

54. But for these requirements, app stores would not impose these barriers to speech. As a result, the Act will cut off minors like A.P. and C.H. from speech and speaking unless and until they can obtain consent. Even if Alabama parents would be willing to consent to their children accessing particular content, the process of finding a parent, requesting consent, and then making that parent take the time to ratify the request impedes the free flow of information and, especially on the internet, creates delays that destroy the value of the speech.[35] *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, *for even minimal periods of time*, unquestionably constitutes irreparable injury.") (emphasis added).

55. The Act's requirement that consent be provided in each individual instance—further evidence that the Act's focus is restricting speech and not promoting parental control—amplifies this burden. It means that a minor must locate and harangue a willing parent *each time* the minor discovers new material she wants to access via a new app or a purchase in an existing app. That may not be possible for minors like A.P. and C.H., whose parents work and have other responsibilities that limit their availability throughout the day. For example, both of C.H.'s parents, M.H. and C.W.H., are full-time educators who often need to go several hours at a time without looking at their phones in order to do their jobs properly. Countless

[35] Br. of Prof. Eric Goldman as Amicus Curiae, *NetChoice, LLC v. Bonta*, No. 5:22-cv-08861-BLF, ECF No. 34-1, at 5–7 (N.D. Cal. Feb. 24, 2023).

other parents also may not, as a practical matter, be able to constantly monitor their devices—due to work, travel, lack of internet access, or otherwise.

56. An analogous brick-and-mortar regime—requiring a teenager entering a bookstore, for example, to FaceTime her parent, have that parent produce a birth certificate or other document demonstrating legal authority, and then have the parent review and pre-approve the child's selection of titles to purchase at checkout—would strike the average American as a bizarre departure from our nation's traditions. Teenagers have long been free to hang around bookstores, newsstands, record stores, arcades, and multiplexes, spending their pocket cash on new releases, comic books, vinyl albums, Pac-Man, and double-features.[36]

57. It is hard to imagine what could justify this censorship. Even if the State could demonstrate that minors need protection from *some* content on *some* apps (and it cannot), that does not justify effectively barring teenagers from *all* content on *all* apps. Nor can the Act be justified by a claim that it empowers parents. Many families, including Plaintiffs, view the Act's top-down, one-size-fits-all granular oversight required by the parental-consent provision as *undermining* parental choices about how to balance levels of autonomy, privacy, and supervision, which

[36] *See, e.g.*, Andrew O'Malley, *A Crisis of Innocence: Comic Books and Children's Culture 1940-1954* § 3, TORONTO MET. UNIV. (Feb. 29, 2024), https://perma.cc/XQ69-ARMQ (describing comic book culture as "a print phenomenon operating by and large outside of adult control" with principal places of purchase at newsstands and drugstores).

may be different for every child. S.P., for example, has made careful decisions to allow A.P. more autonomy and privacy in her digital activities as she has matured, while C.H.'s parents, C.W.H. and M.H., have similarly chosen to reduce oversight of C.H.'s online activity as C.H. has earned greater trust and independence. The Act would require these parents to go back on these decisions and intrude on their children's privacy and autonomy in ways they otherwise would not, overriding their parental decision-making and undermining the trust they have built. These concerns are well founded: studies have found that requiring parents to oversee and consent to their children's online activity can negatively affect the parent-child relationship.[37]

## STANDING

58. Speakers and listeners have standing to challenge government action that regulates the intermediaries they rely on to disseminate and access information when, but for the challenged government action, those intermediaries would continue to provide such access and use. *See Va. Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 & n.15 (1976); *Fla. Right to Life, Inc. v. Lamar*, 273 F.3d 1318, 1322–24 (11th Cir. 2001). And plaintiffs not directly regulated by a statutory regime generally have standing to challenge regulations that

[37] Mariya Stoilova et al., *Do parental control tools fulfill family expectations for child protection? A rapid evidence review of the contexts and outcomes of use*, 18 J. CHILD. & MEDIA 29 (Oct. 29, 2023), https://perma.cc/AWV2-WXWK.

injure them through their coercive effects on directly regulated entities. *See Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 112–16 (2025); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535–36 (1925). That specifically includes parents challenging regulations of third parties alleged to abridge their fundamental rights. *See Mirabelli v. Bonta*, 607 U.S. 492, 498 (2026).

59. A.P. and C.H. have standing because (i) enforcement of the Act against app stores and developers will restrict their constitutional rights to disseminate and access information through apps; (ii) those concrete injuries are traceable to government action—not the app stores and developers themselves—because the app stores and developers would continue to afford Plaintiffs unrestricted access to and use of their services but for the Act, *see, e.g.*, *Comput. & Commc'ns Indus. Ass'n v. Marshall*, Case No. 2:26-cv-00897, ECF Nos. 1, 11-2 ¶¶ 51–57, 11-3 ¶¶ 13–17, 11-4 ¶¶ 9, 46, 49 (M.D. Ala. filed Oct. 28, 2026) (complaint and declarations in action to enjoin the Act for this reason); and (iii) a favorable decision invalidating and enjoining enforcement of the Act as to Plaintiffs' use of the Google Play Store, Amazon Appstore, and Apple App Store to access mobile applications would prevent the state action that causes Plaintiffs' injuries, thereby redressing those injuries. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–62 (1992).[38]

[38] The fact that Plaintiffs' injuries are traceable to the government, and thus redressable by an injunction freeing app stores from the Act's requirements, is underscored by the fact that the major app store platforms have also brought suit to

60. This is true with respect to each portion of the Act Plaintiffs challenge and seek to enjoin. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

61. With respect to the age-verification and parent-identification mandates, A.P. and C.H. use and intend to continue using app stores and apps to send and receive information, and will be subject to the Act's invasive age-verification requirements and its requirement that they link their account to an account of a parent who has independently verified the parent's age and parental authority. Both A.P. and C.H. will thus be restricted from and burdened in accessing fully protected speech disseminated through app stores, and unable to share information with or receive information from those minors with whom they want to exchange information but who are not willing to verify their own ages with app stores or whose parents are not willing to verify their ages and parental authority with app stores.

62. With respect to the parental-consent mandate, A.P. and C.H. use and intend to continue using apps regulated by the Act to send and receive information, and will be presumptively banned from doing so unless they obtain parental consent for each intended app download and purchase of protected speech content in or using an app. This restricts and burdens these Plaintiffs' access to, and ability to engage in, fully protected speech. Plaintiffs, moreover, will be unable to share information

---

enjoin identical requirements in two other states. *See Comput. & Commc'ns Indus. Ass'n v. Paxton*, 814 F. Supp. 3d 787(W.D. Tex. 2025); *Comput. & Commc'ns Indus. Ass'n v. Brown, et al.*, No. 2:26-cv-00094 (D. Utah Feb. 5, 2026).

with or receive information from minors with whom they want to exchange information whose parents are unwilling or unable to convey the consents required under the Act. At minimum, being forced to obtain parental consent to download an app or paid speech content within an app creates a barrier that burdens Plaintiffs' abilities to engage in protected speech.

63. The Parent Plaintiffs, S.P. and M.H., separately have standing to challenge the Act on substantive due process grounds. The Act will require them to provide verified parental consent each time their child downloads an app, first opens a pre-installed app, or attempts to make an in-app purchase, overriding their choices as parents about when and how to supervise their children's lawful app downloads and usage, without justification. S.P. and M.H. would not apply this level of oversight given the choice, and have already made an affirmative decision *not* to impose this level of supervision on A.P. and C.H., which the Act will override. Accordingly, S.P. and M.H. have standing because (i) enforcement of the Act against app stores and developers will interfere with and override their authority to make decisions about how to parent their children; (ii) those concrete injuries are traceable to government action—not the app stores and developers themselves—because the app stores and developers would not impose parental oversight requirements upon the minor Plaintiffs' use of their services but for the Act, *supra* ¶¶ 51, 59; and (iii) a favorable decision invalidating and enjoining enforcement of the Act as to Plaintiffs'

use of the Google Play Store, Amazon Appstore, and Apple App Store to access mobile applications would prevent the state action that causes the parent Plaintiffs' injuries, thereby redressing those injuries.

## CLAIMS FOR RELIEF

64. Plaintiffs challenge these provisions as unconstitutional as applied to A.P.'s and C.H.'s use of the app stores covered by the Act.

## COUNT ONE
## VIOLATION OF THE FIRST AMENDMENT: FREEDOM OF SPEECH
## (All Challenged Provisions as Applied to A.P. and C.H.)

65. Plaintiffs incorporate all prior paragraphs of this Complaint.

66. The First Amendment to the United States Constitution provides that government "shall make no law … abridging the freedom of speech, or of the press." U.S. CONST. amend. I. The First Amendment protects publishing, disseminating, creating, distributing, and consuming speech. *Brown*, 564 U.S. at 792 & n.1. The First Amendment's protections apply without qualification to speech communicated through the internet, *Reno*, 521 U.S. at 852–53, including app stores that curate, host, and provide access to libraries of protected content. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 718–19 (2024); *Packingham v. North Carolina*, 582 U.S. 98, 108 (2017). "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000).

67. The government cannot bar minors from receiving protected speech without their parent's prior consent. *Brown*, 564 U.S. at 794–95 & n.3. "Minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id.* at 794 (citation & internal quotation marks omitted). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable." *Id.* at 795 (citation & internal quotation marks omitted). Nor may the government burden adults' ability to access and engage in "fully protected speech" in the name of protecting children. *Free Speech Coal.*, 606 U.S. at 482–87, 490–93 & n.12.

68. Applying the Act's age-verification, parent-identification, and parental-consent mandates to A.P. and C.H. violates their First Amendment rights by banning and imposing preconditions on delivering and accessing protected speech that effectuates a system of prior restraint and restricts their First Amendment rights to access and disseminate constitutionally protected content. These provisions are subject to strict scrutiny and cannot survive any level of First Amendment review.

69. ***Prior restraint.*** The challenged provisions impose prior restraints on several levels, each of which is presumptively unconstitutional and subject to at least strict scrutiny.

70. First, compelling app stores to collect age-identification information from A.P. and C.H. "as a condition of engaging in protected activity … impose[s] a form of prior restraint" because it formally restricts access to fully protected speech before it can occur and without adjudication. *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 586 n.9 (1983) (citing cases); *see also Vance v. Universal Amusement Co.*, 445 U.S. 308, 311, 316–17 (1980) (statutory precondition was prior restraint). The age-verification and parent-identification mandates thus constitute prior restraints by themselves. *See United States v. Frandsen*, 212 F.3d 1231, 1236–37 (11th Cir. 2000) (prior restraint arises when governments "deny access to a forum for expression before the expression occurs") (citations omitted).

71. Second, the parental-consent requirement that bans A.P. and C.H. from accessing app-store distributed content unless a parent overrides that ban places a further formal preclearance requirement on protected expression. *See Brown*, 564 U.S. at 795 n.3.

72. Third, the Act's overall age-verification and parental-consent scheme imposes a system of informal prior restraint and proxy censorship because it threatens intermediaries with civil liability to coerce them into censoring A.P.'s and C.H.'s access to and ability to engage in speech. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 70–71 (1963).

73. Prior restraints are "the most serious and the least tolerable

infringement on First Amendment rights," and bear a "'heavy presumption'" of invalidity—and thus are subject to a more stringent standard than even strict scrutiny. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558–59 (1976) (citation omitted); *see also Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979). The challenged provisions cannot satisfy that standard, which requires showing the provisions supply the *only* means to address a "direct, immediate, and irreparable" interest of the highest magnitude. *N.Y. Times Co. v. United States*, 403 U.S. 713, 730 (1971) (Stewart, J., concurring); *id.* at 726–27 (Brennan, J., concurring) (same).

74. ***Content-based restrictions.*** Content-based regulations of speech are presumed unconstitutional and cannot survive review if they do not satisfy strict scrutiny. *Brown*, 564 U.S. at 799. The Act's age-verification, parent-identification, and parental-consent provisions are content-based because they are expressly justified in terms of protecting minors, including A.P. and C.H., from the impacts of accessing content distributed through app stores:

- "HB 161 is about protecting children online and putting parents back in control. App Store is a gateway to what our children are exposed to online." —Floor Remarks of Bill Sponsor Rep. Chris Sells, Ala. House of Reps., 2026 Reg. Sess. Day 6 at 27:13– 27:26 (Jan. 14, 2026), https://www.youtube.com/watch?v=bEQ-FF8Dc4A;
- "Whether it be issues related to cyberbullying, exploitation, or access

to inappropriate content, online safety has become a top concern for parents across the state of Alabama … The disturbing reality is that there are people out there who wish to do our children harm, and many of them are utilizing content available in app stores to do so." — (statement by Bill Sponsor Rep. Chris Sells). Hannah Bazinaw, *App Store Accountability Act passes the Alabama House of Representatives*, ABC NEWS 3340 (Jan. 22, 2026), https://abc3340.com/news/local/app-store-accountability-act-passes-the-alabama-house-of-representatives-child-safety-cyber-online;

- "What we're trying to do with this app store bill … puts a barrier so that accidental exposure [to sensitive material] cannot occur." —Floor Remarks of Sen. Clyde Chambliss, Ala. Senate, Sen. Child. & Youth Health Comm. Hr'g on H.B. 161 at 29:20–30:30 (Jan. 28, 2026), https://www.youtube.com/watch?v=1R3YL_TJYLQ;
- "The amount of exposure that [my teenaged children] have to content that frankly shouldn't be seen … but if it's an image of things that are suggestive in nature ... buried within an app, those are things that … I don't want my children seeing." —Floor Remarks of Rep. Russell Bedsole, Ala. House of Reps., State Gov't Comm. Hr'g on H.B. 161 at 25:00–25:40 (Jan. 14, 2026),

https://www.youtube.com/watch?v=QfOGuVcql80).[39]

75. Legislating based on "concern for [speech's] effect" on a particular audience like this is "the essence of content-based regulation." *Playboy*, 529 U.S. at 811–12 (citation omitted).

76. ***Strict scrutiny.*** The Act fails strict scrutiny because the State cannot show that any of the challenged provisions' restrictions on A.P.'s or C.H.'s speech are both necessary and the least-restrictive means to serve a compelling government interest. *Playboy*, 529 U.S. at 813, 817.

77. The State has not identified a concrete problem in need of a legislated solution, nor has it shown that the Act and each of the challenged provisions are necessary to that solution. If the problem concerns harms to minors from unregulated

[39] Statements from the bill's sponsors and supporters to the press further confirm its content-based focus. *See*, *e.g.*, Hannah Bazinaw, *App Store Accountability Act passes the Alabama House of Representatives*, ABC NEWS 3340 (Jan. 22, 2026), https://abc3340.com/news/local/app-store-accountability-act-passes-the-alabama-house-of-representatives-child-safety-cyber-online (Rep. Nathaniel Ledbetter speaker of Ala. House of Representatives speaking in support of H.B. 161, noting that "there is a great deal of content available on these devices that kids simply have no business ever seeing. The bottom line is that parents – not Big Tech or bureaucrats – deserve the final say on what their children can access…"); Ana Barrett, *Alabama Senate Passes Bill Requiring App Stores to Verify Ages of Users*, THE ALABAMA REFLECTOR (Feb. 2, 2026), https://alabamareflector.com/2026/02/06/alabama-senate-passes-bill-requiring-app-stores-to-verify-ages-of-users/ (Ala. Sen. Clyde Chambliss in support of H.B. 161 "there are, unfortunately, things out there that children are not ready to see, their minds have not matured enough to see"); *id.* (statement from Ala. Rep. April Weaver "Just looking at the things that I see on social media, I'm actually horrified that our children are exposed to such things as this at such a young age.").

access to mobile apps, numerous existing parental control tools and other solutions are more flexible and capable of being tailored to the needs of each individual child. The government's solution also overrides parental decision-making about how much or how little oversight is needed over each child's mobile app activities by mandating consent each and every time a minor seeks access to any covered app or content, rather than allowing parents to grant broader consent. *See id.* at 825–26. That the State believes parents are failing to use existing parental control tools effectively is not a compelling government interest that justifies top-down, one-size-fits-all restriction. *See Brown*, 564 U.S. at 803; *accord Playboy*, 529 U.S. at 824.

78. Nor is the Act necessary to promote parental authority. At every step, the Act's age-verification, parent-identification, and parental-consent mandates prioritize the government's desired content regulation over parental choices. Parents are required to micromanage their children's online access; hand over sensitive proof of identification to do so; and are prevented from providing blanket consent, even if they wanted to. The Act gives parents *fewer*—not more—options to tailor their families' digital media habits. Far from supporting parents, the Act imposes as law "what the State thinks parents *ought* to want." *Brown*, 564 U.S. at 794–95, 804.

79. Even if the State could demonstrate that the Act were necessary to accomplish some compelling interest, the State cannot show that the Act and each of its challenged provisions is narrowly tailored and the least restrictive means to do

so—especially in light of the many existing laws Alabama could enforce *without* burdening expression. *See, e.g.*, Ala. Code (effective May 1, 2027) §§ 8-44-4(a)(20), (c); -5(c)(1)–(2); -6(a), -7(b)(2), (4).

80. The Act is overinclusive because it applies to all mobile applications, and all downloadable content within those mobile applications, without regard for whether each of those apps and that content causes the harms the government alleges the Act addresses. The same is true insofar as the Act regulates and treats all minors alike, regardless of differences in those minors' development or their parents' preferences. *See Reno*, 521 U.S. at 865–66.

81. At the same time, the Act is underinclusive because it arbitrarily exempts services that are also available through web browsers (including browsers installed on mobile devices), as well as apps available on non-mobile devices that convey the same information, and content (such as comic books, games, movies, and music) that are available in person.

82. ***Intermediate scrutiny.*** The Act would be unconstitutional even if subjected to intermediate scrutiny, which requires a law (1) to serve a substantial government interest "unrelated to the suppression of free expression" by alleviating in "a direct and material way" harms that are "not merely conjectural," and (2) be narrowly tailored to suppress no more speech "than is essential to the furtherance of that interest." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662–64 (1994)

(cleaned up); *see also Rubin v. Coors Brewing Co*., 514 U.S. 476, 487, 491 (1995).

83. Alabama has done nothing to demonstrate either the existence or the magnitude of harm purportedly caused by the mobile apps and downloadable content that the Act regulates, or how the State's chosen solution will help. The State has made no effort to explain or substantiate how the Act's restrictions relate to or will measurably reduce the purported harms. The First Amendment does not permit the government to restrict speech and then seek information to justify its actions. *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1128 (9th Cir. 2020) (doing so "reflect[s] a fundamental misunderstanding about the State's burden").

84. Critically, and additionally, the Act's broad speech restrictions are the opposite of narrow tailoring: rather than target particular content or particular apps, for example, the Act casts a dragnet that restricts access to enormous swaths of speech on app-based channels on the theory that the impacts of some speech on some people is potentially harmful. That mode of blanket regulation turns the First Amendment upside down and fails even intermediate scrutiny. *See Packingham*, 582 U.S. at 105–08; *City of Ladue v. Gilleo*, 512 U.S. 43, 54–55 (1994); *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574–75 (1987).

85. ***Defects not severable.*** The Act's unconstitutional and interlocking age-verification, parent-identification, and parental-consent mandates are integral to the Act, such that no other provisions could operate without them. The entire Act—and

not just the challenged provisions—accordingly is invalid as applied to Plaintiffs.

86. Unless invalidated and enjoined, Ala. Code §§ 8-19K-2(a)–(b), -3(1)–(3), -4(2), -5, -7, -9(a)(1), (a)(4), (c)(1)–(2), -11, and any rules promulgated under § 8-19K-10 to implement these provisions, will deprive Plaintiffs of their First Amendment rights and cause them to suffer irreparable injuries.

**COUNT TWO**
**VIOLATION OF THE FOURTEENTH AMENDMENT:**
**SUBSTANTIVE DUE PROCESS**
**(Parental Consent Provision as Applied to S.P. and M.H.)**

87. Plaintiffs incorporate all prior paragraphs of this Complaint.

88. The Fourteenth Amendment to the United States Constitution protects fundamental liberty interests against unwarranted governmental intrusion, including parents' fundamental right to direct the care, custody, upbringing, development, and education of their children.

89. The Supreme Court has long recognized that parents possess a fundamental constitutional right to make decisions concerning the upbringing and development of their children free from undue state interference. *See*, *e.g.*, *Mirabelli*, 607 U.S. at 497; *Troxel v. Granville*, 530 U.S. 57, 65–73 (2000); *Meyer v. Nebraska*, 262 U.S. 390, 401 (1923); *Pierce*, 268 U.S. at 534–35.

90. S.P. and M.H. exercise that protected liberty interest by deciding whether, when, and under what degree of supervision their children may access lawful expressive content, applications, educational resources, artistic materials,

entertainment, and other media. Those decisions include judgments about how much independence, privacy, and autonomy each child should be afforded as she matures. *See Troxel*, 530 U.S. at 68–69.

91. The Act overrides those constitutionally protected parental judgments by conditioning minors' access to lawful speech and expression on mandatory age-verification, parent-identification, and individualized parental-consent requirements imposed by the State. Rather than permitting parents to decide for themselves whether and how to supervise their children's online activity, the Act compels parents to monitor and approve their children's access on the State's terms.

92. The Act thereby substitutes the government's preferred model of childrearing and parental supervision for the individualized decisions of fit parents. Parents who reasonably conclude that constant monitoring would undermine trust, healthy development, or their children's growing independence are denied the ability to make those decisions for their own families. *See Pierce*, 268 U.S. at 535; *Meyer*, 262 U.S. at 401.

93. The Constitution does not permit the State to displace parental authority merely because it believes parents should exercise greater supervision over their children's media consumption or online activity. *See Troxel*, 530 U.S. at 72–73; *Brown*, 564 U.S. at 803–04.

94. ***Strict scrutiny***. Because the Act burdens fundamental parental rights protected by the Fourteenth Amendment, it is subject to strict scrutiny. *See Henry v. Sheriff of Tuscaloosa Cnty.*, 180 F.4th 1294, 1298, 1302 (11th Cir. 2026).

95. The Act fails strict scrutiny because the State cannot show that the challenged provisions are narrowly tailored or the least restrictive means of serving a compelling government interest. Even assuming the State has a compelling interest in protecting minors online, the Act broadly imposes mandatory surveillance and individualized consent requirements on *all* parents and minors regardless of their differing needs, maturity, or family judgments.

96. Numerous less restrictive alternatives exist. The State could encourage or expand voluntary parental-control tools, educate parents about available supervision technologies, permit parents to opt out of monitoring requirements, or allow broader or category-based parental consent mechanisms rather than requiring individualized approval for each app or item of content. *See Nunez v. City of San Diego*, 114 F.3d 935, 952 (9th Cir. 1997).

97. The challenged provisions unjustifiably interfere with S.P. and M.H.'s fundamental rights to make individualized decisions regarding their children's upbringing, development, privacy, and access to lawful expression, in violation of the Due Process Clause of the Fourteenth Amendment.

98. Unless invalidated and enjoined, the Parental Consent Provision will continue to deprive S.P. and M.H. of their constitutional rights and cause irreparable injury for which there is no adequate remedy at law.

**PRAYER FOR RELIEF**

99. WHEREFORE, Plaintiffs respectfully request that the Court:

a. Declare that Ala. Code §§ 8-19K-2(a)–(b), -3(1)–(3), -4(2), -5, -7, -9(a)(1), (a)(4), (c)(1)–(2), -11, and any rules promulgated under § 8-19K-10 to implement these provisions, are unconstitutional as applied to Plaintiffs' use of the Apple App Store, the Google Play Store, and the Amazon Appstore to access mobile applications, presently including but not limited to Amazon Music, Amazon Prime Video, Apple Freeform, Apple TV, BAND, Calculator, Canva, CapCut, CloudLibrary, Discord, Disney+, DuckDuckGo, Facebook, Facebook Messenger Kids, Gmail, Glance, Google Meet, GroupMe, IbisPaint, Instagram, Khan Academy, Kindle, Libby, Life360, Lingodeer, Measure, Netflix, Notein, Pinterest, Reddit, Redbubble, Rooms, Snapchat, Threads, TikTok, Twitch, WhatsApp, Wells Fargo, YouTube, YouTube Music, and Zoom;

b. Declare that the unconstitutional provisions are integral to and inseverable from any remaining portions of the Act, such that the entire Act must be declared invalid as applied to Plaintiffs;

c. Preliminarily and permanently enjoin Defendant and his agents,

employees, and all persons acting under their direction or control from taking any action to enforce the unconstitutional provisions of the Act against Plaintiffs' use of the Apple App Store, the Google Play Store, and the Amazon Appstore to access mobile applications, presently including but not limited to Amazon Music, Amazon Prime Video, Apple Freeform, Apple TV, BAND, Calculator, Canva, CapCut, CloudLibrary, Discord, Disney+, DuckDuckGo, Facebook, Facebook Messenger Kids, Gmail, Glance, Google Meet, GroupMe, IbisPaint, Instagram, Khan Academy, Kindle, Libby, Life360, Lingodeer, Measure, Netflix, Notein, Pinterest, Reddit, Redbubble, Rooms, Snapchat, Threads, TikTok, Twitch, WhatsApp, Wells Fargo, YouTube, YouTube Music, and Zoom;

d. Enter judgment in favor of Plaintiffs;

e. Award Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action, under 42 U.S.C. § 1988; and

f. Award Plaintiffs all other relief as the Court deems just and proper.

Respectfully submitted this 28th day of October 2026.

By:*/s/ John G. Thompson*
John G. Thompson

Adam S. Sieff*
Haley B. Zoffer*
DAVIS WRIGHT TREMAINE LLP
350 S. Grand Avenue, 27th Floor
Los Angeles, California 90071
Tel.: (213) 633-6800
adamsieff@dwt.com
haleyzoffer@dwt.com

Abigail B. Everdell*
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
New York, New York 10020
Tel.: (212) 603-6468
abigaileverdell@dwt.com

John G. Thompson
Mary Clark Logan
LIGHTFOOT, FRANKLIN & WHITE, LLC
400 20th Street North
Birmingham, Alabama 35203
Tel.: (205) 581-0748
jthompson@lightfootlaw.com
mclogan@lightfootlaw.com

Ambika Kumar*
Nicole Saad Bembridge*
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Tel.: (206) 622-3150
ambikakumar@dwt.com
nicolesaadbembridge@dwt.com

David M. Gossett*
Celyra I. Myers*
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
Tel.: (202) 973-4200
davidgossett@dwt.com
celyramyers@dwt.com

*Attorneys for Plaintiffs*

*pro hac vice application forthcoming