**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

A.P., *by and through next friend* S.P.; S.P., *in her individual capacity*; C.H., *by and through her parents* C.W.H. *and* M.H.; *and* M.H., *in her individual capacity*,

*Plaintiffs*,

v.

STEVEN MARSHALL, *in his official capacity as Alabama Attorney General*,

*Defendant*.

**CIVIL CASE NO.: 26-00904**

**ORAL ARGUMENT REQUESTED**

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**


INTRODUCTION ....................1

FACTUAL BACKGROUND ....................3

A. App Stores Are Libraries for Digital Content. ....................3

B. Plaintiffs Access App Stores for Educational, Artistic, and Political Speech. ....................4

C. Existing Tools and Laws Already Empower Parents to Control Access to Mobile Apps and Protect Minors from Adult Content. ....................6

D. The Act Age-Gates and Imposes a Mandatory Parental Preclearance Regime for Apps and App-Based Information. ....................8

LEGAL STANDARD ....................10

ARGUMENT ....................11

I. Plaintiffs Are Likely To Prevail On The Merits. ....................11

A. The Act Restricts Access to Fully Protected Speech. ....................11

B. Strict Scrutiny Applies to the Challenged Provisions. ....................12

1. The challenged provisions create a system of prior restraint. ....................12

2. The challenged provisions cannot be justified without reference to the effect of content on its audience. ....................17

C. The Challenged Provisions Fail Any Level of First Amendment Scrutiny. ....................20

1. The challenged provisions are not necessary to directly and materially address any real, compelling interest. ....................20

2. The challenged provisions are not the least restrictive means, much less narrowly tailored. ....................23

3. The challenged provisions are also substantially underinclusive. ....................25

4. The challenged provisions fail even intermediate scrutiny. ....................26

D. The Challenged Provisions Violate Parent Plaintiffs' Fundamental Rights To Guide Their Children's Development. .........30

II. The Remaining Factors Favor A Preliminary Injunction. ................................35

III. The Court Should Not Require A Bond. .....................................................38

CONCLUSION .........................................................................................38

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021).....28

*Anonymous v. City of Rochester*,
13 N.Y.3d 35 (2009).....34

*Ashcroft v. ACLU*,
542 U.S. 656 (2004).....17

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002).....24

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963).....12, 13

*Barrett v. Walker Cnty. Sch. Dist.*,
872 F.3d 1209 (11th Cir. 2017).....12, 14

*Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*,
482 U.S. 569 (1987).....29

*Bellotti v. Baird*,
443 U.S. 622 (1979).....31

*BellSouth Telecomms., Inc. v. MCImetro Access Trans. Servs.*,
425 F.3d 964 (11th Cir. 2005).....38

*Boos v. Barry*,
485 U.S. 312 (1988).....17

*Bourgeois v. Peters*,
387 F.3d 1303 (11th Cir. 2004).....14, 16–17

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011).....*passim*

*Burk v. Augusta-Richmond Cnty.*,
365 F.3d 1247 (11th Cir. 2004).....13

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994).....28, 29

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988).....16

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
747 F. Supp. 3d 1011 (W.D. Tex. 2024) ....................26

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier*,
--- F.4th ---, 2026 WL 3071065 (11th Cir. Oct. 14, 2026)....................16, 18, 29, 30

*Edenfield v. Fane*,
507 U.S. 761 (1993)....................28

*Elrod v. Burns*,
427 U.S. 347 (1976)....................36

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ....................3

*Ex parte E.R.G.*,
73 So. 3d 634 (Ala. 2011)....................34

*FEC v. Cruz*,
596 U.S. 289 (2022)....................27

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025)....................*passim*

*Free Speech Coal., Inc. v. Rokita*,
738 F. Supp. 3d 1041 (S.D. Ind. 2024)....................15

*Henry v. Sheriff of Tuscaloosa Cnty.*,
180 F.4th 1294 (11th Cir. 2026) ....................31

*Henry v. Sheriff of Tuscaloosa Cnty.*,
--- F.4th ---, 2026 WL 2916691 (11th Cir. Sep. 29, 2026)....................35

*Hodgkins v. Peterson*,
355 F.3d 1048 (7th Cir. 2004) ....................34

*Honeyfund.com, Inc. v. DeSantis*,
622 F. Supp. 3d 1159 (N.D. Fla. 2022) ....................38

*Interstate Circuit, Inc. v. City of Dallas*,
390 U.S. 676 (1968)....................13

*Johnson v. City of Opelousas*,
658 F.2d 1065 (5th Cir. Unit A 1981) ....................34

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022)....................12

*Mahanoy Area Sch. Dist. v. B.L.*,
594 U.S. 180 (2021)....................22

*Mahmoud v. Taylor*,
606 U.S. 522 (2025)....................................................................................37

*Martin v. City of Struthers*,
319 U.S. 141 (1943)......................................................................................5

*Mason v. Fla. Bar*,
208 F.3d 952 (11th Cir. 2000) .....................................................................28

*Meyer v. Nebraska*,
262 U.S. 390 (1923)....................................................................................33

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Rev.*,
460 U.S. 575 (1983)....................................................................................14

*Mirabelli v. Bonta*,
607 U.S. 492 (2026)......................................................................31, 36, 37

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)...............................................................................11, 27

*N.Y. Times Co. v. United States*,
403 U.S. 713 (1971)....................................................................................13

*Neb. Press Ass'n v. Stuart*,
427 U.S. 539 (1976)...............................................................................12, 13

*NetChoice v. Carr*,
789 F. Supp. 3d 1200 (N.D. Ga. 2025).....................................................14, 20

*NetChoice v. Jones*,
822 F. Supp. 3d 656 (E.D. Va. 2026) ..........................................................16

*NetChoice v. Murrill*,
812 F. Supp. 3d 594 (M.D. La. 2025)..................................20, 23, 24, 28

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) ..............................................................13, 23

*NetChoice, LLC v. Fitch*,
738 F. Supp. 3d 753 (S.D. Miss. 2024) .................................................20, 24

*NetChoice, LLC v. Griffin*,
2025 WL 978607 (W.D. Ark. Mar. 31, 2025)........................................23, 24

*NetChoice, LLC v. Reyes*,
748 F. Supp. 3d 1105 (D. Utah 2024)...............................................20, 23, 24

*Nken v. Holder*,
556 U.S. 418 (2009)....................................................................................37

*Nunez v. City of San Diego*,
114 F.3d 935 (9th Cir. 1997) ....................................................................33, 35

*Otto v. City of Boca Raton*,
981 F.3d 854 (11th Cir. 2020) ........................................................................37

*Packingham v. North Carolina*,
582 U.S. 98 (2017)...........................................................................................30

*Pierce v. Soc'y of Sisters*,
268 U.S. 510 (1925)..........................................................................................31

*Reno v. ACLU*,
521 U.S. 844 (1997)...................................................................................3, 11, 24

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)...........................................................................................36

*Scott v. City of Daytona Beach*,
186 F.4th 1286 (11th Cir. 2026) ...............................................................24, 26

*Se. Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975)..........................................................................................13

*Smith v. Daily Mail Publ'g Co.*,
443 U.S. 97 (1979)...........................................................................................13

*Snyder v. Phelps*,
562 U.S. 443 (2011)..........................................................................................22

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)...........................................................................11, 18, 19, 22

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022) .......................................................................11

*Texas v. Johnson*,
491 U.S. 397 (1989)..........................................................................................19

*Troxel v. Granville*,
530 U.S. 57 (2000)....................................................................................31, 35, 37

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994)....................................................................................26, 27

*United States v. Eichman*,
496 U.S. 310 (1990)..........................................................................................19

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000)......................................................................11, 17, 20, 21, 23

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) ..... 11

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ..... 30

**Constitutional Provisions**

U.S. Const. amend. I ..... *passim*

U.S. Const. amend. XIV ..... 30

**Statutes**

15 U.S.C. §§ 6501–05 ..... 7

Alabama Code

§ 8-19G-2 ..... 7

§ 8-19G-3 ..... 7, 23

§ 8-19K-1 ..... *passim*

§ 8-19K-2 ..... 9, 26, 38

§ 8-19K-3 ..... 9, 10, 38

§ 8-19K-4 ..... 10, 18, 38

§ 8-19K-5 ..... 9, 38

§ 8-19K-7 ..... 9, 38

§ 8-19K-9 ..... 10, 38

§ 8-19K-10 ..... 10, 38

§ 8-19K-11 ..... 8, 10, 38

§ 8-19K-13 ..... 26

§ 8-19K-15 ..... 8

§ 8-44-7 ..... 8

§ 13A-6-122 ..... 7

§ 13A-6-241 ..... 7

§ 13A-12-191 ..... 7

§ 13A-12-192 ..... 7

§ 13A-12-197 ..... 7

§ 16-1B-4 ....................7
§ 16-28B-3 ....................7
§ 16-28B-4 ....................7
§ 16-28B-5 ....................7

**Other Authorities**

Eric Goldman, *The "Segregate-and-Suppress" Approach to Regulating Child Safety Online*, 28 Stan. Tech. L. Rev. 173 (2025) ....................15
11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2954 (3d ed. 2019) ....................38

## INTRODUCTION

The Alabama App Store Accountability Act, Ala. Code § 8-19K-1 *et seq.*, requires everyone in Alabama to prove their age before downloading mobile apps or accessing paid content within those apps. Minors must also obtain parental consent. The Act thus bans teens like A.P. and C.H. from accessing even political and educational material on mobile devices without their parents' permission. Parents like S.P., C.W.H., and M.H. must also prove their authority to provide the requisite permission. And parents who grant permission are forced to review all the apps and paid content their child sees even if—like the Parent Plaintiffs in this action—they believe such surveillance undermines their child's development.

The Act violates the First Amendment as applied to Plaintiffs' use of app stores to download mobile content, including educational materials, news, political information, entertainment, and other fully protected communications. Governments have no "free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794–95 (2011). Yet Alabama has attempted just that—creating a system of prior restraints that bars children from accessing app-based speech and supplants parents' freedom to moderate their children's access to apps. This violates the rule that speech "neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable

for them," and the rule that the government has no "power to prevent children from hearing or saying anything without their parents' prior consent." *Id.* at 795 & n.3 (cleaned up). Just as Alabama could not compel a bookstore to screen patrons and stop minors from buying books without their parents' permission, the State cannot ban minors from downloading apps or paid app content without such consent.

The Act also independently violates S.P.'s and M.H.'s fundamental right to make developmental decisions involving how much independence to grant their children on their mobile devices. By requiring individualized consent as to each and every app and app-based purchase—and renewed consent each time an app notices a significant change, until a child is 18 years old—the Act prohibits these parents from tailoring the level of oversight they want to apply, which may differ between children and over time. The regime substitutes the State's judgment mandating total surveillance of every child for that of even fit parents, like S.P., C.W.H., and M.H., who would make different decisions in the best interests of their individual children, at different stages of their respective development.

Plaintiffs are Alabama teens and parents that the Act will restrict from communicating, accessing information, engaging in protected expression, and parenting as they see fit. Because Plaintiffs will suffer the irreparable loss of fundamental freedoms if the Act takes effect in January 2027, they bring this motion

to preliminarily enjoin enforcement of the Act's challenged provisions as applied to their use of covered app stores to access mobile applications.

## FACTUAL BACKGROUND

### A. App Stores Are Libraries for Digital Content.

App stores allow anyone with a mobile device and an internet connection to access the accumulated sum of virtually all recorded human knowledge. Through Apple's iOS App Store alone, more than 1 billion people have access to tens of millions of apps, published by more than 30 million app developers. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 967 (9th Cir. 2023). Other major app stores in the United States include the Google Play Store for Android OS devices, the Amazon Appstore for Fire Tablets and Fire TV systems, the Galaxy Store for Samsung devices, and the Microsoft Store for Surface devices. Most Americans, and nearly all teenagers, use app stores to access, engage with, and contribute to the wealth of information and expression disseminated online. Sieff Decl. Exs. 1–3. They have become the dominant vehicle for young people's speech and communication. A.P. Decl. ¶¶ 3–17; C.H. Decl. ¶¶ 3–18.

The information distributed through app stores is "as diverse as human thought." *Reno v. ACLU*, 521 U.S. 844, 852 (1997) (cleaned up). Some applications, like internet browsers, are tools for searching and discovering information online. Others, such as WhatsApp, Discord, and Slack, provide messaging services for

direct communication. Weather apps provide forecasts, maps, and emergency alerts. Bible apps—including YouVersion and Bible App for Kids—provide Scripture, devotionals, and religious instruction. Other apps designed for children, like PBS KIDS Video, Khan Academy Kids, and ScratchJr, offer educational programs, lessons, stories, and creative tools. ChessKid and LiChess are two of many chess apps that offer instruction, puzzles, and competitive play. Spotify, Netflix, Kindle, Audible, and similar apps contain libraries of music, movies, television programs, books, audiobooks, and podcasts. Coursera, Codecademy, and Duolingo provide educational material. News organizations—including the Birmingham News, the Mobile Press-Register, the Wall Street Journal, ESPN, Sports Illustrated, the Atlantic, and many others—offer apps that distribute reporting, essays, and videos. Apps like Substack and Medium allow users to create and publish their own work.

### B. Plaintiffs Access App Stores for Educational, Artistic, and Political Speech.

Plaintiffs include two Alabama teens who the Act will restrict from communicating, accessing information, and engaging in protected expression. A.P. is a 16-year-old homeschooled high school junior who uses apps and paid content downloaded from the Google Play Store and Amazon Appstore—including Khan Academy, Kindle, Lingodeer, GroupMe, IbisPaint, Discord, and TikTok—to complete her homeschool coursework, organize projects for a community service organization, engage with and share political content, and create digital art. A.P.

Decl. ¶¶ 1–4, 6, 10, 12. C.H. is a 16-year-old high school junior who uses apps and paid content downloaded from the Apple App Store—including Instagram, Threads, Canvas, Discord, BAND, GroupMe, and YouTube—to engage in extracurricular activities, engage in anti-censorship advocacy, and express her views on current events. C.H. Decl. ¶¶ 1–3, 5, 7–12, 14.

Mobile devices and apps are central vehicles for young people's speech and communication. Sieff Decl. Exs. 1–3; A.P. Decl. ¶¶ 3–13; C.H. Decl. ¶¶ 3–15. Teenagers use apps to follow current events, organize around public issues, study, explore their faith, create art, and maintain friendships. Sieff Decl. Exs. 3; 10; A.P. Decl. ¶¶ 4–12; C.H. Decl. ¶¶ 4–15. Many apps provide training grounds for adult citizenship, allowing young people to debate ideas, participate in civic organizations, and address audiences beyond their schools and neighborhoods. A.P. Decl. ¶¶ 5, 12, 24; C.H. Decl. ¶¶ 8–11, 26–31. In short, "[t]he widespread use of this method of communication by many groups espousing various causes attests its major importance." *Martin v. City of Struthers*, 319 U.S. 141, 145 (1943).

Apps also help young people find purpose and community. Sieff Decl. Ex. 10. A.P. uses apps to complete her homeschool coursework, engage in theater and music activities, visual art, crocheting, and community-service work, and communicate with friends she cannot see in a traditional school setting, while C.H. uses apps to participate in anti-censorship advocacy, engage with political and social issues,

maintain friendships, and connect with peers who share her interests in music, media, and free expression. A.P. Decl. ¶¶ 5, 11–12; C.H. Decl. ¶¶ 8–11, 26–31.

### C. Existing Tools and Laws Already Empower Parents to Control Access to Mobile Apps and Protect Minors from Adult Content.

App stores, mobile devices, and apps already give parents substantial tools to tailor their children's online experiences. Sieff Decl. Exs. 7 ¶ 22; 8 ¶ 8; 9 ¶ 13. App-store controls allow parents to require parental consent for children to download some or all apps. Device controls permit parents to manage children's online activities, including their use of particular apps, and limit device use. *Id.* Exs. 17–18. And third-party apps allow parents to control access to their kids' social media and other accounts. *Id.* Exs. 13–16. Parents can also guide app use through family rules and ongoing conversations. S.P. Decl. ¶¶ 5–12; M.H. Decl. ¶¶ 5–20; C.W.H. Decl. ¶¶ 4–7, 12.

With these tools, families are well-equipped to guide their children's app usage. S.P.'s approach has included using app-level parental controls at the outset, reviewing apps together as a family before downloading, discussing online safety and privacy practices, and gradually giving A.P. more independence as she consistently demonstrated good judgment and responsibility. S.P. Decl. ¶¶ 5–11. M.H.'s approach has included establishing family rules for device use and online safety, monitoring her children's social media activity more closely when they were

younger, and then reducing oversight when a child matures and demonstrates responsibility, as C.H. has done. M.H. Decl. ¶¶ 5–8, 12–19; C.W.H. Decl. ¶ 14.

Alabama already regulates online criminal conduct and limits children's access to adult content they have no First Amendment right to obtain. The State criminalizes solicitation of children, Ala. Code § 13A-6-122, sexual extortion, *id.* § 13A-6-241, the production, dissemination, and possession of child sexual abuse material, *id.* §§ 13A-12-191, -192, -197, and mandates school policies addressing cyberbullying and internet safety, *id.* §§ 16-28B-3–5, 16-1B-4. Since October 2024, the State has also required apps and online services to age verify their users if more than one-third of the content they publish is adult sexual content that is not constitutionally protected as to minors. *Id.* §§ 8-19G-2(1), (10), -3(a). The Supreme Court upheld such laws in *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461 (2025).

Existing laws also already give parents tools to manage their children's personal information when they download app store content. The Federal Children's Online Privacy Protection Act (COPPA), for example, imposes heightened data collection and use restrictions when apps and app stores direct their services to minors. *See* 15 U.S.C. §§ 6501–05. And Alabama just enacted comprehensive rules restricting how online services may process and monetize minors' personal data,

including by prohibiting the sale of minors' personal data without consent. *See* Ala. Code § 8-44-7(b)(2), (4).

### D. The Act Age-Gates and Imposes a Mandatory Parental Preclearance Regime for Apps and App-Based Information.

Despite these existing tools and laws, Alabama passed the Act, which the Attorney General may begin enforcing on January 1, 2027. *See* Ala. Code §§ 8-19K-1, -11, -15. The Act governs app stores serving users in Alabama and developers whose apps are offered through those stores or pre-installed on mobile devices. *Id.* § 8-19K-1(7), (9). Purportedly enacted to protect minors' safety and empower parents, Sieff Decl. Exs. 4–5 (statements of Sen. Chambliss and Rep. Sells), the Act creates an interlocking age-verification and parental-consent regime that prohibits minors from accessing apps or paid content within apps absent parental consent.

***Scope.*** The Act broadly governs app stores, defined as any "website, software application, or electronic service that allows account holders to download apps from third-party developers onto a mobile device," and developers that own or control apps "made available through an app store or a pre-installed app." Ala. Code § 8-19K-1(6), (9). Pre-installed apps are those "present on a mobile device at the time of purchase, initial activation, or first use by the consumer," and expressly include browsers, search engines, messaging apps, and other software installed or partially installed before purchase, activation, or first use. *Id.* § 8-19K-1(18).

***Age-verification and parental-verification mandates.*** Before anyone in Alabama may download apps from an app store or access paid content within an app, the store must use approved commercially available methods to "[v]erify the individual's age category." *Id.* § 8-19K-2(a)(1), (2). If the app store determines that the user is under eighteen, it must deny her access to the content until she "affiliate[s] with a parent account." *Id.* § 8-19K-3(1).

To that end, app stores must verify that a prospective parent account belongs to an adult who is the minor's "biological parent," "legal guardian," or otherwise has "legal custody" authorizing them to make decisions on the minor's behalf. *Id.* § 8-19K-1(15), (16). The Act does not explain what information is sufficient to prove legal parental authority.

***Parental consent mandate.*** Affiliating with a verified parent is only the start. Each time teens seek to download an app, buy content within an already-downloaded app, or access the contents of the pre-installed apps on their device, they must "[o]btain verifiable parental consent." *Id.* §§ 8-19K-3(2), -7(2). Consent requires providing the parent with the app's "age rating," including a description of the app's content that informed the rating, if it exists, as well as its data collection and sharing, and security methods. *Id.* § 8-19K-1(17), (20)(b), (c). Teens who cannot obtain consent are banned from accessing the app or content. *Id.* §§ 8-19K-3(2)–(3), -7(2). App stores also must share this information with app developers, *id.* § 8-19K-5, who

in turn must bar teens from accessing their apps or paid content absent consent, *id.* § 8-19K-9(a)(4).

Families that want no part of this state-ordered surveillance have no choice. Parents and guardians must separately consent before a minor may download or purchase an app or make an in-app purchase. *Id.* § 8-19K-3(2). And even after a parent consents, app stores must seek consent anew before providing access to a "significantly changed version of the app." *Id.* § 8-19K-4(2)(b).

***Enforcement.*** The Attorney General has exclusive authority to enforce the Act as a deceptive trade practice. *Id.* §§ 8-19K-10, -11. A knowing or reckless violation exposes app stores and developers to civil penalties of up to $7,500 per violation, plus attorney fees and costs. *Id.* § 8-19K-11(a). Punitive damages are available. *Id.* § 8-19K-11(b). Given the number of mobile device users in Alabama, penalties under the Act could prove extraordinary. Avoiding these penalties will require restricting Alabamians (including Plaintiffs) from using app stores to access protected media, entertainment, information, and forums for communication.

## LEGAL STANDARD

A preliminary injunction is warranted when plaintiffs show (1) a likelihood of success on the merits, (2) irreparable injury absent relief, (3) the threatened injury outweighs any harm to the party they seek to enjoin, and (4) an injunction would not

disserve the public interest. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022). Each factor favors relief here.

## ARGUMENT

### I. Plaintiffs Are Likely To Prevail On The Merits.

#### A. The Act Restricts Access to Fully Protected Speech.

The First Amendment protects the creation, dissemination, and right to access ideas and expression. *See Brown*, 564 U.S. at 792 & n.1; *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 & n.15 (1976). Those protections apply without qualification to online media, *Reno*, 521 U.S. at 852–53, including information and ideas communicated through mobile applications distributed through app stores. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 718–19 (2024). They also apply to minors, who "are entitled to a significant measure of First Amendment protection," and whose rights to access protected speech not obscene to them "cannot be suppressed." *Brown*, 564 U.S. at 794–95.

Online age-screens are always subject to First Amendment scrutiny because they "necessarily" burden the "First Amendment right to access speech." *Free Speech Coal.*, 606 U.S. at 495. The government thus "bears the burden of proving the constitutionality of its actions" that abridge these protections, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000), under some form of "heightened judicial scrutiny." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557, 563 (2011);

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524, 532 (2022). Critically, the Act is fundamentally unlike the adult content law upheld in *Free Speech Coalition* because it indiscriminately restricts access to "fully protected" materials, and is not targeted to adult content—or even apps intended to carry such content—that minors have no First Amendment right to access. 606 U.S. at 482–85, 490–92 & 493 n.12.

The Act's age-verification and parent-identification mandates and its parental-consent mandate instead condition access to news, education, art, religion, politics, entertainment, and communication tools on government-prescribed permission. It fails any First Amendment standard.

**B. Strict Scrutiny Applies to the Challenged Provisions.**

The Court should apply strict scrutiny for two independent reasons.

**1. The challenged provisions create a system of prior restraint.**

Strict scrutiny applies because the challenged provisions subject speech to several overlapping prior restraints. A prior restraint is any government action that in substance prevents or deters speech without a prior judicial determination that "the government can deny … expression before the expression occurs." *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1223 (11th Cir. 2017) (internal quotation omitted); *see Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 70–71 (1963). Prior restraints present "the most serious and the least tolerable infringement on First Amendment rights," and bear a "heavy presumption" of invalidity. *Neb. Press Ass'n*

*v. Stuart*, 427 U.S. 539, 558–59 (1976); *see also Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979); *Burk v. Augusta-Richmond Cnty.*, 365 F.3d 1247, 1251 (11th Cir. 2004). To survive review, a prior restraint must be the only means to address a "direct, immediate, and irreparable" interest of the highest magnitude—a standard more stringent than strict scrutiny. *N.Y. Times Co. v. United States*, 403 U.S. 713, 730 (1971) (Stewart, J., concurring); *id.* at 726–27 (Brennan, J., concurring) (same).

At the outset, the Act's overall age-verification, content-classification, and preclearance regime effects a prior restraint by requiring app stores and developers to classify content through parental consent disclosures, § 8-19K-1(4), (8), (17), and restrict how that content is disseminated. That mirrors the ordinance in *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 678–88 (1968), which required theaters to classify films as "suitable for young persons" before screening them, as well as the regulation in *Southeast Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 n.8 (1975), where the mere existence of a state-ordered classification system "stood as a warning" that effectuated an informal prior restraint against hosting third-party speech. *See also Bantam Books*, 372 U.S. at 67–69 (informal classification and supervision regime created prior restraint). The Ninth Circuit enjoined a similar law in *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024), holding that forcing online intermediaries to classify and block potentially harmful content unconstitutionally "deputize[d] private actors into censoring speech."

Each set of challenged provisions also independently constitutes a prior restraint. The age verification and parent-identification mandates "impose[] a form of prior restraint" because they compel Plaintiffs and all Alabamians—teens and adults—to provide age-identification and parental-authority documentation "as a condition of engaging in protected activity," thus preventing access to fully protected speech before it can occur and without adjudication. *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 586 n.9 (1983). Such statutory barriers to speech, lifted only upon satisfaction of some state-imposed condition, pose classic prior restraints even if a speaker or reader is willing to satisfy the government's requirements. *See Barrett*, 872 F.3d at 1223 (policy was a prior restraint "because it *prevents* members of the public from speaking … unless they comply with" state-imposed preconditions); *Bourgeois v. Peters*, 387 F.3d 1303, 1319 (11th Cir. 2004) (requiring protesters to pass through metal detector was prior restraint). A court in this Circuit thus recently acknowledged the "serious" chilling effects imposed by universal age verification *whether or not* access is ultimately granted. *See NetChoice v. Carr*, 789 F. Supp. 3d 1200, 1224–27 (N.D. Ga. 2025), *vacated on other grounds*, 2026 WL 3079563 (11th Cir. 2026) (vacating because facial relief was not warranted, and not reaching the merits).

The consequences for Plaintiffs are real. Users who will not or cannot provide identifying information, or whom a system misclassifies, lose access before any

adjudication. *See* Eric Goldman, *The "Segregate-and-Suppress" Approach to Regulating Child Safety Online*, 28 STAN. TECH. L. REV. 173, 192 (2025) (explaining that "registration walls" "will reduce publishers' audience and revenues"). And some Alabamians would stop using apps rather than provide ID, and cut off their children rather than provide proof of parental authority. Sieff Decl. Ex. 26 at 5585–86. Sixty-six percent of Americans "are not comfortable sharing their identification documents or biometric information with online platforms," and 70 percent are "uncomfortable with their children using such methods." *Free Speech Coal., Inc. v. Rokita*, 738 F. Supp. 3d 1041, 1049 (S.D. Ind. 2024) (citation modified), *vacated on other grounds*, 2025 WL 2027434 (7th Cir. 2025). Their reluctance is understandable. *See* Goldman, *supra* at 205 n.129, 206–08 (privacy risks of age verification cause self-censorship); *see also* Sieff Decl. Exs. 25 at § 5 (leading age-verification system poses privacy and security risks); 27 at 22–24; 28 at 6–8, 21–22.

The parental-consent mandate adds another layer of prior restraint by establishing a state-backed parental veto over the information a teenager may access. *Brown*, 564 U.S. at 795 n.3. Plaintiffs A.P. and C.H., who both have a constitutional right to access non-obscene content in app stores' libraries, are banned from doing so by default. A.P. Decl. ¶¶ 4–5, 12, 18–19; C.H. Decl. ¶¶ 4–12, 22–25. This makes the Act akin to the law invalidated in *Brown*, 564 U.S. at 794–95, which banned minors from purchasing or renting constitutionally protected video games without

parental approval, and not the law upheld in *Free Speech Coalition*, 606 U.S. at 482, which "regulates only speech that is obscene to minors." As in *Brown*, the Act's preclearance mandate unlawfully burdens the fully protected speech both of teens and those who wish to speak with them. *See also, e.g.*, *NetChoice v. Jones*, 822 F. Supp. 3d 656, 674–76 (E.D. Va. 2026) (comparable age-verification and parental-consent regime failed strict scrutiny under *Brown*).

The Eleventh Circuit's recent decision in *Computer & Communications Industry Association v. Uthmeier*, --- F.4th ---, 2026 WL 3071065 (11th Cir. Oct. 14, 2026), does not hold otherwise. No plaintiff there argued that Florida's law imposed a prior restraint. And the court's conclusion that *that law* was content neutral says nothing about whether the Act constitutes a prior restraint: even if the Act were content neutral (and it is not for the reasons addressed below), content-neutral laws impose prior restraints when they condition access to speech upon the satisfaction of some government mandate. *Cf. City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 764 (1988) (even "content-neutral prohibitions on a particular manner of speech" impose prior restraints when they "*condition* that speech on obtaining a license or permit from a government official in that official's boundless discretion"). The Act does exactly that. *See also Bourgeois*, 387 F.3d at 1319 (content-neutral policy requiring individuals to clear a government checkpoint before entering a

protest was a prior restraint even "putting aside the question of the [police's] unlimited discretion" in deciding who could enter).

**2. The challenged provisions cannot be justified without reference to the effect of content on its audience.**

Strict scrutiny also applies because the challenged provisions are content-based. "A law can regulate the content of protected speech, and thereby trigger strict scrutiny, either 'on its face' or in its justification." *Free Speech Coal.*, 606 U.S. at 482. The latter category includes laws that cannot be justified without reference to "the direct impact that speech has on its listeners." *Boos v. Barry*, 485 U.S. 312, 321 (1988); *Playboy*, 529 U.S. at 811–12 (same).

The challenged provisions are content based under this test. The Act's overall premise—that minors like A.P. and C.H. must be shielded from fully protected but supposedly inappropriate information—is focused on content. *See Ashcroft v. ACLU*, 542 U.S. 656, 670 (2004) (strict scrutiny applies to laws "designed to protect minors from viewing harmful materials"); *Playboy*, 529 U.S. at 811–12 (strict scrutiny applies where "[t]he overriding justification for the regulation is concern for the effect of the subject matter on young viewers"). This is clear from the Act's text requiring app stores to provide verified parents with ratings assessing "the suitability of an app's content" for different age groups—including summaries of "the specific content elements" that support a particular age classification—as part of its preclearance regime. Ala. Code § 8-19K-1(4), (8), (17), (20)(b). It is also

evident from the Act's provision requiring app stores to revoke access to apps, notwithstanding prior parental consent, whenever an app's content changes. *Id.* §§ 8-19K-1(19)(c), -4(2)(b). The Act thus encodes a content-based preference to shield children from protected but supposedly age-inappropriate content.

*Uthmeier* does not command a different result. Florida there targeted assertedly content-agnostic features of social media—including infinite scroll, push notifications, and autoplay—to combat compulsive use, a justification the Eleventh Circuit found unrelated to the content of the expression conveyed. *Uthmeier*, 2026 WL 3071065, at *10–11. Not so here. Unlike the Florida law, the Act's text shows an obvious content-based purpose to shield minors from expression Alabama deems unsuitable. And unlike in *Uthmeier*—where there was no legislative history before the court—the legislative record here confirms the Act's content-based purpose. *See* Sieff Decl. Ex. 4 (Senate sponsor Clyde Chambliss worries that children encounter "content that their mind was not ready to receive," which "has created chaos" and "problems in those children's lives"); *id.* Ex. 5 (House sponsor Rep. Chris Sells describes app stores as "a gateway to what our children are exposed to online"); *id.* Ex. 6 (Sen. April Weaver explains she is "horrified that our children are exposed to such things as this at such a young age," referring to content shared on social media apps). This is exactly how the Supreme Court unearthed the Vermont legislature's content-based purpose in *Sorrell*—reviewing for content-based motives in the

statute's text, and then probing the legislative record to dispel "[a]ny doubt" about the law's content-based purposes, 564 U.S. at 563–65—and the same approach yields the same conclusion here.

The Act in this respect resembles the Flag Protection Act of 1989 that the Supreme Court struck down in *United States v. Eichman*, 496 U.S. 310 (1990). Congress enacted that law after the Supreme Court decided *Texas v. Johnson*, 491 U.S. 397 (1989), which held that a Texas law criminalizing the desecration of the United States flag with knowledge it would offend onlookers was unconstitutional as applied to an individual who burned a flag during a protest. To avoid strict scrutiny, Congress "cast the Flag Protection Act of 1989 in somewhat broader terms" and argued that at most intermediate scrutiny applied because the law was facially content neutral—it applied to all kinds of flag desecration—and did not "target expressive conduct on the basis of the content of its message." *Eichman*, 496 U.S. at 315, 317. The Supreme Court rejected this argument, holding that "[d]espite [its] wider scope" the law was subject to strict scrutiny because it could not be justified "without reference to the content of the regulated speech" as it "suppresses expression out of concern for its likely communicative impact" on those who engage with it. *Id.* at 317–18 (internal marks and quotation omitted). The Act's dragnet approach—similarly taken to appear content neutral and avoid strict scrutiny—does

the same, restricting access to app-based media based on concerns that such access risks exposure to at least *some* harmful, exploitative, or addictive content.

Alabama may not create a "new category of content-based regulation" for minors. *Brown*, 564 U.S. at 794. Like other laws conditioning access to protected speech on parental consent, the Act is subject to strict scrutiny. *See, e.g.*, *Carr*, 789 F. Supp. 3d at 1222; *NetChoice v. Murrill*, 812 F. Supp. 3d 594, 651 (M.D. La. 2025); *NetChoice, LLC v. Fitch*, 738 F. Supp. 3d 753, 775–76 (S.D. Miss. 2024), *vacated on other grounds*, 134 F.4th 799 (5th Cir. 2025) (facial relief standard not met); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1121–24 (D. Utah 2024).

### C. The Challenged Provisions Fail Any Level of First Amendment Scrutiny.

"Strict scrutiny is unforgiving" and effectively "fatal" "absent truly extraordinary circumstances." *Free Speech Coal.*, 606 U.S. at 484–85. A law subject to strict scrutiny is presumptively invalid unless the government shows it is necessary to achieve a compelling interest and uses the least restrictive means. *See Playboy*, 529 U.S. at 813, 817. The challenged provisions fail this test as well as the intermediate scrutiny applicable to content-neutral regulations.

#### 1. The challenged provisions are not necessary to directly and materially address any real, compelling interest.

The State unquestionably has a compelling interest in protecting minors' mental and physical health, at least as an abstract and general objective. But the State

"must present more than anecdote and supposition" to show the challenged provisions here are actually necessary to *accomplish* that objective. *Playboy*, 529 U.S. at 822. The Act rests on no such evidence. *Cf.* Sieff Decl. Exs. 23 ¶¶ 10–44, 49 (expert report in similar case concluding that minors' access to app-based content is not linked to mental-health problems); 29–30; 31 at 63–65; 32 at 22, 37–39. Alabama simply *assumes* that apps and downloaded content directly and proximately harm minors and then *asserts* that censorship is a necessary and effective solution. *See id.* Exs. 33–34; 35 at 9–14. That "predictive judgment" is not enough. *Brown*, 564 U.S. at 799–800 (rejecting even correlative evidence because a proven "causal link" is required).

Alabama's lack of evidence is unsurprising. Apps benefit many young people, and there is no evidence of a causal link between app-distributed content and adverse effects in adolescents. *See* Sieff Decl. Exs. 11–12; 19–22; 29–32. This is consistent with Plaintiffs' own experience. *See* A.P. Decl. ¶¶ 3–15 (describing educational, artistic, social, political, and health-related benefits from app use); C.H. Decl. ¶¶ 3–19 (describing benefits to education, advocacy, friendship, emotional support, and civic engagement). In fact, preventing teens from accessing certain apps could *harm* their mental health and development. *See* C.H. Decl. ¶¶ 9–10, 12–14, 25–31 (apps help C.H. maintain friendships, feel less isolated, engage with diverse viewpoints, and participate in advocacy); A.P. Decl. ¶¶ 5, 8, 13, 19, 21–22 (apps are essential to

A.P.'s sense of belonging, extracurricular activities, communication with friends, and ability to manage chronic health conditions); Sieff Decl. Exs. 23 ¶¶ 39–44; 24.

Without evidence that the Act's restrictions are necessary to prevent or eliminate any harms, simply preventing teens from engaging with apps and app-based content is not a legitimate government interest—no more than mandating early bedtimes, banning Harry Potter novels, or limiting time spent listening to Taylor Swift albums. Minors have a First Amendment right to access non-obscene speech. *Brown*, 564 U.S. at 794–95. "That the State finds expression" disseminated through app stores—or the *way* that expression is disseminated through app stores—"too persuasive" or "catchy" for young people "does not permit it to quiet the speech or to burden its messengers." *Sorrell*, 564 U.S. at 577–78 (government may not stifle *how* speech is conveyed, such as through "slogans," "picketing," or "march[es]," to blunt "the force" of its impact). All media "invites" engagement and seeks to capture and hold attention, and "[t]he better it is" the more it succeeds at "draw[ing] the reader" in. *Brown*, 564 U.S. at 798 (citation omitted) (video games no less protected because they are interactive and engaging). Nor does a concern that speech might be too distressing for some audiences justify its suppression. *See Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 185, 190–91 (2021) (profane criticism protected despite upsetting classmates); *Snyder v. Phelps*, 562 U.S. 443, 450–51, 458 (2011) (insulting picketing protected despite parental anguish at son's funeral).

Choosing whether and how young people may access protected media are decisions for families to make, not the government to mandate.

**2. The challenged provisions are not the least restrictive means, much less narrowly tailored.**

Even if Alabama had evidence that minors' current family-moderated access to app stores poses real harms justifying government action, the State cannot show that age screening *everyone* in Alabama and banning minors from accessing *any* app store content without individualized parental consent is the "least restrictive" method to eliminate that harm. *Playboy*, 529 U.S. at 827.

Alabama "could have easily employed less restrictive means to accomplish its protective goals, such as by (1) incentivizing companies to offer voluntary content filters or application blockers, (2) educating children and parents on the importance of using such tools, and (3) relying on existing criminal laws that prohibit related unlawful conduct." *Bonta*, 113 F.4th at 1121; *see also, e.g.*, *Murrill*, 812 F. Supp. 3d at 651–52; *Reyes*, 748 F. Supp. 3d at 1127; *NetChoice, LLC v. Griffin*, 2025 WL 978607, at *13–14 (W.D. Ark. Mar. 31, 2025). App stores and mobile devices both allow parents to control the apps their children access. S.P. Decl. ¶¶ 6–8 (describing past use of parental controls, age-rating restrictions, app-download alerts, and streaming-service content limits for A.P.). And Alabama *already* bans minors from accessing content that they are not constitutionally entitled to see. *See* Ala. Code § 8-19G-3(a). Because Alabama "could simply enforce the laws already on its books"

to protect children, or use its authorities to encourage private use of existing tools, "it may not address the problem indirectly by prohibiting speech that's only arguably associated" with the broader social ills it identifies. *Scott v. City of Daytona Beach*, 186 F.4th 1286, 1309–10 (11th Cir. 2026).

The challenged provisions are thus also inherently overinclusive and not narrowly tailored, since their only additive applications are to burden adults and to ban minors from accessing "fully protected" app store content. *Free Speech Coal.*, 606 U.S. at 482–87, 490–93 & 493 n.12; *see Brown,* 564 U.S. at 794–95. Indeed, the Act is significantly more overinclusive than the laws enjoined in *Murrill*, *Fitch, Reyes*, and *Griffin* since it burdens and presumptively bans access to *any* app store content. Restricting access to vast libraries of protected content because some apps may potentially contain some less-than-fully-protected content "turns the First Amendment upside down." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002); *see also Reno*, 521 U.S. at 882 (citing cases).

Any argument that the Act is purportedly "narrowly tailored" to aid parents—as some Alabama legislators have suggested—is meritless. *Brown* rejected the notion that it "is a proper governmental means of aiding parental authority" to "punish[] third parties for conveying protected speech to children just in case their parents disapprove of that speech." 564 U.S. at 802. And that interest is especially inapt here, as the Act does not enable parents but overrides them by making the

State's choices the default, *id.*, and provides no mechanism for willing parents to grant blanket consent for their children's app use. Some parents (like S.P., M.H., and C.W.H.) would permit their children to access apps they are eligible to download. S.P. Decl. ¶¶ 9–13, 17–18; M.H. Decl. ¶¶ 12–20, 22–28; C.W.H. Decl. ¶¶ 11–12. Others might give blanket access to paid content in news and sports apps where kids can learn about the midterm elections or watch college football highlights. Forcing parents to surveil their children and provide repeated consent on the State's terms abridges the "rights of young people" to access content their parents deem "harmless," *Brown*, 564 U.S. at 805, and undermines parents' ability to manage their households as they see fit. S.P. Decl. ¶¶ 4, 9–13, 17–23; M.H. Decl. ¶¶ 5–20, 22–30; C.W.H. Decl. ¶¶ 12, 14–15.

**3. The challenged provisions are also substantially underinclusive.**

The Act's underinclusivity is also "alone enough to defeat it." *Brown*, 564 U.S. at 802. A law that professes to serve broad goals like preventing harm to minors, and yet regulates only a fraction of the alleged harm's potential causes "raises serious doubts about whether the government is in fact pursuing the interest it invokes" rather than censoring particular media. *Id.* (citing cases). Here, as in *Brown*, the Act focuses on a subset of media—mobile apps disseminated through app stores and paid content within apps—available on a subset of devices (on phones and tablets) yet excludes free content within apps, all content available online but not in mobile apps,

and content available through physical media or accessed on laptop or desktop computers, smart televisions, e-readers, or gaming consoles. Ala. Code § 8-19K-1(10), (13). The State thus "inexplicably targets only one" vector for the "speech-related problem[s]" it asserts "while leaving unburdened similar threats" to the same supposed interests. *Scott*, 186 F.4th at 1311; *see also, e.g.*, *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1037 (W.D. Tex. 2024) (law targeting social media apps underinclusive because "[a] teenager can read Peter Singer advocate for physician-assisted suicide in *Practical Ethics* on Google Books but cannot watch his lectures on YouTube or potentially even review the same book on Goodreads"), *aff'd*, 184 F.4th 420 (5th Cir. 2026).[1]

**4. The challenged provisions fail even intermediate scrutiny.**

A speech restriction can survive intermediate scrutiny only if the government proves the law (1) serves a "real" and "not merely conjectural" government interest "unrelated to the suppression of free expression," and (2) "will in fact" serve that interest in "a direct and material way" (3) that is narrowly tailored to suppress no more speech "than is essential to the furtherance of that interest." *Turner Broad.*

[1] The grandfathering rules amplify the Act's illogical underinclusivity. Although old accounts must be age-verified by October 1, 2027, the Act does not require blocking access to apps installed before October 1, 2026, unless parental consent is revoked or the app significantly changes. Ala. Code §§ 8-19K-2(a), -13(5). That means one teenager may continue using an app installed before the grandfathering date, while an otherwise identically situated minor may be unable to download the same app after the Act takes effect without parental consent.

*Sys., Inc. v. FCC*, 512 U.S. 622, 662–64 (1994) (citation omitted). The challenged provisions fail this test too.

***No evidence the challenged provisions achieve any state interest.*** There is no evidence that the Act advances even its purported goal of protecting minors from harmful online content.

*First*, the Act fails intermediate scrutiny because "correct[ing] the mix" of fully protected speech teens may access is "related to the suppression of free expression" and an impermissible basis to restrict speech under any standard. *Moody*, 603 U.S. at 740 (citation omitted). The Act targets minors' use of apps as a means to suppress access to fully protected but supposedly inappropriate content within apps. This is clear from the Act's text and legislative history, *supra* § I.B.2, most clearly by mandating the disclosure of age ratings and content descriptions, reflecting the State's aim to restrict access even to protected content based on the supposed suitability of the expression. *See* Ala. Code § 8-19K-1(4), (8), (17).

*Second*, the legislative record lacks evidence establishing that unmitigated access to libraries of protected content presents a real problem, much less that the Act's parental-consent regime actually addresses that or any problem directly. "[M]ere conjecture" positing the existence of a problem is not "adequate to carry a First Amendment burden[,]" and the State may not restrict speech because it might prevent some "anticipated harm." *FEC v. Cruz*, 596 U.S. 289, 307 (2022).

*Third*, nothing in the record shows the Act will protect minors from any harm—conjectural or otherwise. *See Mason v. Fla. Bar*, 208 F.3d 952, 957–58 (11th Cir. 2000) (rejecting speech restriction where State failed to produce concrete evidence of the harm it sought to prevent); *see also Edenfield v. Fane*, 507 U.S. 761, 771–72 (1993) (direct evidence, not just speculation or conjecture, required). The most current research shows no "causal relationship" between the use of app-based media "and health harms to minors." *Murrill*, 812 F. Supp. 3d at 651; *see also* Sieff Decl. Exs. 30; 32; 33. If anything, the evidence shows that *restricting* teens' access to apps and app-based content will, for many, cause harm. *Supra* § I.C.1.

***No evidence of narrow tailoring.*** Even a substantial government interest "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609 (2021) (citation omitted). The Act violates that rule, indiscriminately restricting access to all information published through app stores, including fully protected speech, rather than addressing just harmful content or conduct, or even just some subset of apps that supposedly carry special risks.

The Act thus mirrors the blanket regulation banning all residential yard signs enjoined as categorically overinclusive in *City of Ladue v. Gilleo*, 512 U.S. 43 (1994). *City of Ladue* held that such "prohibitions foreclosing entire media"—even if they are "completely free of content or viewpoint discrimination"—fail

intermediate scrutiny because they "suppress too much speech" and "eliminat[e] a common means of speaking." *Id.* at 55. That is exactly what the Act does by restricting the dissemination of expressive media and forums for communication through the mobile apps most Americans use to obtain news, entertainment, and other information.

In fact, the Act's deliberate overbreadth resembles the extraordinary blanket restriction on *all expressive activities* at Los Angeles International Airport that the Supreme Court invalidated in *Board of Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569, 574–75 (1987). The government there, as here, made no attempt to regulate only those activities that "might create problems," but enacted a "sweeping ban" that reached "virtually every individual." *Id.* at 575. Such an "absolute prohibition" failed not just intermediate scrutiny, but even the more deferential scrutiny applicable to non-public forums. *Id.*

*Uthmeier* is not to the contrary. The four tailoring factors that led the Eleventh Circuit to uphold Florida's law are non-existent here. *First*, the Act is not "age delimited." *Uthmeier*, 2026 WL 3071065, at *13. It applies uniformly to all minors, without any of the "fine-grained distinctions" between younger adolescents and "budding adults" that Florida's H.B. 3 attempted to codify. *Id. Second*, unlike H.B. 3, the Act prevents minors from accessing apps and app-based content altogether, not just "their ability to create their own accounts." *Id. Third*, the Act cannot be

characterized as a "conditional ban" on the use of certain features because app stores and developers cannot "refrain[] from using" any features to avoid regulation. *Id.* *Finally*, and perhaps most critically, H.B. 3 was limited to a subset of platforms with certain features that Florida lawmakers deemed connected to social harms. *Id.* The Act by contrast casts a dragnet that sweeps in *all* apps and app-based content.

The Act is accordingly much closer to the unconstitutional law in *Packingham v. North Carolina*, 582 U.S. 98 (2017), that *Uthmeier* distinguished. 2026 WL 3071065, at *14. *Packingham* involved a blanket restriction on access to social-networking websites that the government claimed was necessary to protect children. 582 U.S. at 107–08. In holding the law unconstitutional, the Supreme Court explained that the law was "unprecedented in the scope of First Amendment speech it burdens," and that its indiscriminate suppression of access to "vast realms of human thought and knowledge" was accordingly not narrowly tailored to survive even intermediate scrutiny. *Id.* at 105–06, 107–08.

### D. The Challenged Provisions Violate Parent Plaintiffs' Fundamental Rights To Guide Their Children's Development.

The Act simultaneously violates the Parent Plaintiffs' rights to make decisions about their children's development and upbringing. The Fourteenth Amendment protects against "government interference with certain fundamental rights and liberty interests" that are "deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (citation omitted). Parents'

authority over their children's care and upbringing is "perhaps the oldest of the fundamental liberty interests recognized" by the Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see also Bellotti v. Baird*, 443 U.S. 622, 639 n.18 (1979) (citing cases establishing "a constitutional parental right against undue, adverse interference by the State"). This right reflects a firm "presumption that fit parents act in the best interests of their children," and that the government cannot displace parents' protected childrearing decisions merely because it believes parents should make a better choice. *Troxel*, 530 U.S. at 68–70, 72–73. Just this year, the Supreme Court reaffirmed parents' rights to "participat[e] in decisions regarding their children's mental health." *Mirabelli v. Bonta*, 607 U.S. 492, 497 (2026). Laws that burden such fundamental parental rights must withstand strict scrutiny. *See Henry v. Sheriff of Tuscaloosa Cnty.*, 180 F.4th 1294, 1298, 1302 (11th Cir. 2026).

Parent Plaintiffs assert the right to decide whether and under what level of supervision their 16-year-old children may select and receive lawful media. S.P. Decl. ¶¶ 4, 8–13, 17–23; M.H. Decl. ¶¶ 5–20, 22–30. Deciding *not* to surveil their children is a clear exercise of their constitutionally protected parental rights because children are not "mere creature[s] of the state" and their parents "have the right" to "prepare [them] for additional obligations" in the manner they deem best suited to their development. *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925) (law

compelling attendance at public schools violated parents' rights to choose private, independent, or parochial schools instead).

S.P., for example, has deliberately permitted A.P. to freely access educational, artistic, news, entertainment, and other expressive materials through the Google Play Store, subject to the family's own rules about data privacy.[2] S.P. Decl. ¶¶ 4–11, 17–18. She believes A.P.'s access to those resources is critical to A.P.'s mental health and development. *Id.* ¶¶ 3–4, 18–20, 23. When A.P. was younger, S.P. used several voluntary app-level parental controls to ensure A.P. was not exposed to material she felt was inappropriate. *Id.* ¶¶ 6–7. But as A.P. got older, S.P. lifted those restrictions, and now relies on A.P. to come to her to discuss new apps and purchases on her own. S.P. believes the Act's forced surveillance of A.P.'s choices is wrong, would damage the trust their family has built, and would undermine A.P.'s development. *Id.* ¶¶ 8–13, 17, 20–23.

Likewise, M.H. has deliberately allowed C.H. increasing independence in selecting apps, media, and online communications within apps, and considers that independence essential to C.H.'s proper development and sound understanding of the world. M.H. Decl. ¶¶ 5–20; *see also* C.W.H. Decl. ¶¶ 6–7, 12. M.H. has seen

---

[2] S.P. also strongly opposes sharing sensitive personal information online, and she has taught A.P. to avoid doing so wherever possible. S.P. Decl. ¶¶ 5, 22. The Act's verifiable parental consent requirement would likely force her to abandon her longstanding efforts to protect her family's privacy to preserve A.P.'s access to the digital world. *Id.* ¶ 22.

how her approach helped C.H. develop confidence, self-assurance, and good judgment. M.H. Decl. ¶¶ 20–21; *see also* C.W.H. Decl. ¶¶ 11–12. M.H. believes the Act would override her parenting decisions, force intrusive monitoring inconsistent with her family's values, undermine years of carefully built trust, and interfere with C.H.'s development and independence. M.H. Decl. ¶¶ 22–30; *see also* C.W.H. Decl. ¶¶ 18, 20.

Simply put, by conditioning their children's access to protected speech on permissions that the Parent Plaintiffs have deliberately chosen *not* to require, the Act replaces their reasoned judgments with surveillance on the State's terms. *See Meyer v. Nebraska*, 262 U.S. 390, 401 (1923) (state cannot interfere with parents' choices to expose their children to disfavored instruction and developmental experiences).

Cases enjoining mandatory curfew laws demonstrate parents' fundamental right to resist state-imposed supervision of their children. In *Nunez v. City of San Diego*, 114 F.3d 935, 951–52 (9th Cir. 1997), the Ninth Circuit applied strict scrutiny to invalidate a San Diego curfew law that did "not allow an adult to pre-approve even a specific activity after curfew hours," finding compulsory accompaniment for every activity interfered with parents' decisions to afford their children independence. This "exercise of sweeping state control irrespective of parents' wishes" violated the fundamental rights of parents who viewed independence as "part of the process of growing up." *Id.* at 952. The Fifth Circuit likewise held that

a city's interest in protecting minors was "not sufficient to justify the removal of the decision … from the children['s] parents." *Johnson v. City of Opelousas*, 658 F.2d 1065, 1074 (5th Cir. Unit A 1981). And the New York Court of Appeals similarly rejected a city's asserted interest in "promoting parental supervision" where an ordinance "fail[ed] to offer parents enough flexibility or autonomy" to make individualized decisions for each of their children in all of their various activities. *Anonymous v. City of Rochester*, 13 N.Y.3d 35, 50–51 (2009); *see also Hodgkins v. Peterson*, 355 F.3d 1048, 1065 (7th Cir. 2004) (curfew exceptions were insufficient to "minimize the state's restraint on parental authority").

The challenged requirements similarly fail strict scrutiny as applied to the Parent Plaintiffs. Just as the cities above had no compelling interest in forcing parents to consent to *each* of their children's evening activities, the State has no legitimate (much less compelling) interest in forcing Parent Plaintiffs to surveil each app and item of app-based content their children download over their objections, especially without the option to pre-approve any specific categories. *See also Ex parte E.R.G.*, 73 So. 3d 634, 647–48 (Ala. 2011) (forcing parents to provide grandparents with visitation rights over their objections advanced no compelling government interest). Even if it did, less restrictive alternatives exist. The State could educate parents about voluntary parental controls. *See* S.P. Decl. ¶¶ 6–8 (discussing use of these tools). It could also allow parents who disagree with mandatory

individualized consent to opt out altogether. *See Nunez*, 114 F.3d at 952 (lack of curfew exceptions or pre-approval option not narrowly tailored). Those alternatives would encourage oversight without forcing Parent Plaintiffs to betray their values and surveil their children in ways that conflict with their assessment of their best interests. S.P. Decl. ¶¶ 14–15, 21–23; M.H. Decl. ¶¶ 22–26, 30.

Once a parent identifies "a plausible, less restrictive alternative, the government must prove" its inadequacy. *Henry v. Sheriff of Tuscaloosa Cnty.*, --- F.4th ---, 2026 WL 2916691, at *9 (11th Cir. Sep. 29, 2026) (citation modified). The State's preference for greater parental surveillance does not justify eschewing these alternatives here. *See Troxel*, 530 U.S. at 73 (forced visitation statute unconstitutionally failed to limit the parties "who may petition for visitation or the circumstances in which such a petition may be granted"); *see also Brown*, 564 U.S. at 803–04 (rejecting parental authority justification where legislation's "effect is only in support of what the State thinks parents *ought* to want"). Because the challenged provisions unjustifiably displace Parent Plaintiffs' protected decisions about the media and information their children may access—and because they do so without even affording them the flexibility to grant blanket or other forms of bulk consent—they must be enjoined.

## II. The Remaining Factors Favor A Preliminary Injunction.

The remaining preliminary injunction factors are also satisfied.

Unless the preliminary injunction is granted, the Act will deny A.P. and C.H.—and the hundreds of thousands of young people in Alabama—access to protected speech and fora for constitutionally protected expression. A.P. Decl. ¶¶ 18–22; C.H. Decl. ¶¶ 22–26. It is well settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Each day the Act is in force, Plaintiffs are denied access to news, educational content, and platforms for creative expression. These lost opportunities for speech, learning, and participation in public discourse can never be restored. *See also Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (reaffirming same).

Plaintiffs are among the many suffering these irreparable harms. A.P. and C.H. need to be able to follow the news, A.P. Decl. ¶ 12; C.H. Decl. ¶¶ 7, 28–30, communicate with their teachers and extracurricular organizations, A.P. Decl. ¶¶ 5–9; C.H. Decl. ¶¶ 4–6, 9, participate in advocacy and community groups, A.P. Decl. ¶ 5; C.H. Decl. ¶¶ 9–10, conduct research, A.P. Decl. ¶ 4, and publish content online now and in real time, A.P. Decl. ¶¶ 10–12; C.H. Decl. ¶¶ 11–12—not after waiting however long for their parents to consent, and certainly not until after they turn 18 or when final judgment is eventually entered in this case.

Parent Plaintiffs will also suffer irreparable harm while their constitutionally protected rights to decide what is best for their children are denied. *See Mirabelli*,

607 U.S. at 497. A preliminary injunction is necessary to prevent irreparable deprivations of these freedoms—and the resulting irreversible changes to these parents' relationships with their children, and those children's development—while this case is litigated. *See* S.P. Decl. ¶¶ 15, 22; M.H. Decl. ¶¶ 5, 20, 26; *see also* C.W.H. Decl. ¶¶ 18–20.

The equities and public interest also support an injunction. Those factors merge when the government is the opposing party, *Nken v. Holder*, 556 U.S. 418, 435 (2009), and favor an injunction here. Unless the Act is enjoined, Plaintiffs and thousands of Alabama families will suffer immediate First Amendment harms. Parents like Parent Plaintiffs will be forced to supervise all of their children in the same state-specified respects even if they disagree or believe that different children at different ages would be best served by different treatment. On the other side of the ledger, "neither the government nor the public has any legitimate interest in enforcing an unconstitutional [law]." *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020). Enjoining a law burdening First Amendment rights is thus always "equitable and in the public interest." *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025).

A preliminary injunction would protect Alabama parents' authority to make decisions about the types of media and information each of their children should be permitted to view and the level of monitoring they will provide. *See Troxel*, 530 U.S. at 65–66. Alabama legislators pay lip service to this liberty, but have supplanted it

with their own judgment of what "parents *ought* to want." *Brown*, 564 U.S. at 804. An injunction is needed to protect the balance the Constitution strikes.

## III. The Court Should Not Require A Bond.

The Court has discretion to enter an injunction without requiring a bond because constitutional rights are at stake, *BellSouth Telecomms., Inc. v. MCImetro Access Trans. Servs.*, 425 F.3d 964, 971 (11th Cir. 2005); 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2954 n.8, n.29 (3d ed. 2019), and should not require one here, *see Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1186 (N.D. Fla. 2022) (no bond required where plaintiff sought relief from speech restrictions).

## CONCLUSION

Plaintiffs respectfully request an order enjoining enforcement of Ala. Code §§ 8-19K-2(a)–(b), -3(1)–(3), -4(2), -5, -7, -9(a)(1), (a)(4), (c)(1)–(2), -11, and any rules promulgated under § 8-19K-10 to implement these provisions, as applied to Plaintiffs' use of the Amazon Appstore, Apple App Store, and Google Play Store to access mobile apps.

DATED: October 29, 2026

Respectfully submitted,

By: */s/ John G. Thompson*
John G. Thompson

Adam S. Sieff*
Haley B. Zoffer*
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, California 90071-3487
Tel: 213.663.6800
adamsieff@dwt.com
haleyzoffer@dwt.com

Ambika Kumar*
Nicole Saad Bembridge*
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Tel: 206.622.3150
ambikakumar@dwt.com
nicolesaadbembridge@dwt.com

Abigail B. Everdell*
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: 212.489.8230
abigaileverdell@dwt.com

David M. Gossett*
Celyra Myers*
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Tel: 202.973.4200
davidgossett@dwt.com
celyramyers@dwt.com

John G. Thompson
Mary Clark Logan
LIGHTFOOT, FRANKLIN & WHITE, LLC
400 20th Street North
Birmingham, Alabama 35203
Tel: 205.581.0700
jthompson@lightfootlaw.com
mclogan@lightfootlaw.com

*Attorneys for Plaintiffs*

*pro hac vice application forthcoming